IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 16-10643 |
| | § | |
| CHRISTOPHER MARTIN RIDGEWAY | § | SECTION "A" |
| | § | |
| DEBTOR | § | CHAPTER 11 |

## **DEBTOR'S FOURTH AMENDED PLAN OF REORGANIZATION (AS IMMATERIALLY MODIFIED ON FEBRUARY 20, 2017)**

Robin B. Cheatham, Bar Roll #4004
ADAMS AND REESE LLP
4500 One Shell Square
701 Poydras Street, Suite 4500
New Orleans, Louisiana  70139
Telephone:     (504) 585-0307
Fax:               (504) 566-0210
Email: robin.cheatham@arlaw.com

AND

Patrick L. McCune, Bar Roll #31863
ADAMS AND REESE LLP
North Chase Tower
450 Laurel Street, Suite 1900
Baton Rouge, LA  70801
Telephone:     (225) 378-3215
Fax:               (225) 336-5110
Email: patrick.mccune@arlaw.com

*Attorneys for Christopher Martin Ridgeway, the Debtor*

DATED: February 20, 2017

1

## **EXHIBITS**

Exhibit A            Executory Contracts and Unexpired Leases to Be Rejected

Exhibit B            Causes of Action Retained and Reserved by the Reorganized Debtor

Exhibit C            Revised Notice Showing  Payment of Property Taxes Concerning Property at 579 Woodvine Avenue, Jefferson Parish, Louisiana, from Sheriff and *Ex Officio* Tax Collector of Jefferson Parish, Louisiana

Exhibit D            A Summary of Claims which, as of July 29, 2016, were either included in the Schedules or for which there is a filed Proof of Claim, and the Claim arising from the Proof of Claim filed by the Louisiana Department of Revenue.

Exhibit E            A copy of the Order Establishing Bar Date for Filing Proofs of Claim; Doc. No. 82

Exhibit F            A copy of the Escrow Agreement between Debtor, Whale Capital, LP and Stryker Corporation

Exhibit G            A draft of the Assignment, Pledge and Security Agreement between Whale Capital, LP and Debtor\Reorganized Debtor regarding the Exit Financing From Whale Capital, L.P.

Exhibit H            A draft of the Promissory Note between Whale Capital, LP and Debtor\Reorganized Debtor regarding the Exit Financing From Whale Capital, L.P.

2

**INTRODUCTION**

Pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Christopher Martin Ridgeway (the "**Debtor**") respectfully proposes the following Amended Plan of Reorganization (as it may be amended or supplemented from time to time, and including all Exhibits and Schedules, the "**Plan**"):

**ARTICLE I**
**RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, DEFINED TERMS**

Section 1.1     **Rules of Interpretation**.  Whenever appropriate from the context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and each pronoun, whether stated in the masculine, feminine or neuter gender, shall include the masculine, feminine and the neuter gender.  Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented.  Unless otherwise specified, all references in the Plan to Sections, Articles, Exhibits, and Schedules are references to Sections, Articles, Exhibits, and Schedules of or to the Plan.  Captions and headings to Sections, Articles, Exhibits, and Schedules are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  In the event of a conflict between the terms of the body of this Plan and the terms of any Exhibit or Schedule, the terms of the body of this Plan shall control.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Any reference herein to any Law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.  The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Plan in its entirety and not to any particular provision hereof.  With respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including."   The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.  Any term used in the Plan that is not defined herein but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to them in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Section 1.2     **Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply as though the Plan is an order of the Bankruptcy Court.

Section 1.3     **Governing Law**.  Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, the

rights and obligations arising under the Plan shall be governed by, and construed in accordance with, the Laws of the State of Louisiana, without giving effect to the principles of conflicts of laws thereof.

Section 1.4 **Defined Terms**. The following terms, as used herein, have the following meanings:

"**Administrative Expense Claim**" means any Claim constituting a cost or expense of the administration of the Bankruptcy Cases asserted under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the estate of the Debtor, any actual and necessary costs and expenses of operating as  Debtor, any indebtedness or obligations incurred or assumed by the Debtor in connection with the administration and implementation of the Plan, the administration, prosecution or defense of Claims by or against the Debtor and for distributions under the Plan, any Claims for compensation and reimbursement of expenses arising during the period from and after the Petition Date and to the Effective Date or otherwise in accordance with the provisions of the Plan, and any fees or charges assessed against the Debtor's estate pursuant to 28 U.S.C. § 1930; provided that Professional Fee Claims shall not constitute Administrative Expense Claims.

"**Affiliate**" means, as to any Entity, any Subsidiary of such Entity, or any other Entity which, directly or indirectly, controls, is controlled by, or is under common control with, such Entity.  For the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities or partnership interests, or by contract or otherwise.

"**Allowed**" means, with reference to any Claim, (a) any Claim against the Debtor which has been listed by the Debtor in its Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount, not disputed or contingent and as and to the extent that no contrary proof of claim or interest has been filed, (b) any Claim explicitly and specifically allowed hereunder, (c) any Claim which is not Disputed, or (d) any Claim which, if Disputed, (i) as to which, pursuant to the Plan or a Final Order of the Bankruptcy Court, the liability of the Debtor and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court, or (ii) has been allowed hereunder or by Final Order; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder.  Unless otherwise specified herein, in section 511 of the Bankruptcy Code, or by order of the Bankruptcy Court, "Allowed" Administrative Expense Claims, "Allowed" Claims, shall not, for purposes of computation of distributions under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

"**Applicable Fees and Costs**" means, if and to the extent not included in an Allowed Claim, the Allowed fees, costs, and expenses (including Professional Fee Claims) due to the Holder of an Allowed Claim (if any) under the written agreement with the Debtor giving rise to the Allowed Claim or, if there is no such an agreement or applicable Law dictates that such an agreement does not control, under applicable Law.

"**Assets**" means all assets of any nature whatsoever, including the property of the Estate pursuant to section 541 of the Bankruptcy Code, Causes of Action, Cash, Cash equivalents, claims of right, interests and property, real and personal, tangible and intangible.

"**Bankruptcy Case**" means the bankruptcy case filed by the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, Case No. 16-10643, in the United States Bankruptcy Court for the Eastern District of Louisiana on March 23, 2016.

"**Bankruptcy Code**" has the meaning set forth in the initial paragraph hereof.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Louisiana.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Bankruptcy Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and any Local Rules of the Bankruptcy Court.

"**Business Day**" means a day other than a Saturday, a Sunday or any other day on which commercial banks in New Orleans, Louisiana are required or authorized to close by law or executive order.

"**Cash**" means the lawful currency of the United States of America.

"**Causes of Action**" means any and all rights, claims, causes and rights of action, whether unliquidated or contingent of the Debtor existing as of the Effective Date, that are not released, waived, remitted, settled or compromised under the Plan or prior to the Effective Date, including without limitation, any such rights, claims, causes of action, suits, and proceedings (i) arising under applicable non-bankruptcy Law, which the Debtor may have as debtor and debtor in possession (exercising the rights and powers of a trustee pursuant to section 1107(a) of the Bankruptcy Code), under section 541 of the Bankruptcy Code, (ii) which the Debtor may have as debtor and debtor in possession (exercising the rights and powers of a trustee pursuant to section 1107(a) of the Bankruptcy Code), under sections 544 through 553 (inclusive) of the Bankruptcy Code, (iii) under section 510(c) of the Bankruptcy Code, and (iv) as may be asserted defensively in connection with any objection to a Disputed Claim.

"**Claim**" means any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown; or any right to an

equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**"Claim No. ___"** refers to proofs of claim filed in the claims registry of the Bankruptcy Case.

**"Class"** means a category of Holders of Claims, as more fully described in Article III of the Plan.

**"Clerk"** means the clerk of the Bankruptcy Court.

**"Collateral"** means any property or interest in property of the Debtor's Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code, or other applicable Law.

**"Confirmation"** means the entry of the Confirmation Order.

**"Confirmation Date"** means the date upon which the Clerk enters the Confirmation Order on the docket in the Bankruptcy Case.

**"Confirmation Hearing"** means the hearing to consider Confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as the same may be adjourned from time to time.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**"Consummation"** means the occurrence of the Effective Date

**"Creditor"** means any Entity that is the holder of a Claim against the Debtor or property of the Debtor that arose on or before the commencement of the Bankruptcy Case or a Claim against the Debtor's estate of a kind specified in section 502 of the Bankruptcy Code.

**"Debtor"** has the meaning set forth in the initial paragraph hereof.

**"Disclosure Statement"** means the Disclosure Statement filed by the Debtor on the date hereof, as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions hereof relating to the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

**"Disputed Claim"** means any Claim against the Debtor, to the extent the allowance of which is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, or is otherwise disputed

by the Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been resolved in the Plan or withdrawn or determined by a Final Order.

"**Distribution**" means a distribution of Cash or other non-Cash consideration made by the Debtor or, after the Effective Date, the Reorganized Debtor pursuant to the Plan.

"**Docket No.___**" shall refer to docket entries in the Bankruptcy Case.

"**Effective Date**" means the time on the first Business Day (a) which is on or after the date of the entry of the Confirmation Order and (b) on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions to the effectiveness of the Plan have been satisfied or waived as provided in Article XI, section 11.1, et seq., but no later than 10 days from the date of the Confirmation Order.

"**Entity**" means a person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a Governmental Authority or any subdivision of any of the foregoing or any other entity.

"**Escrow Account**" means that certain account to be established with Regions Bank pursuant to an Escrow Agreement wherein the Exit Financing is deposited received from Whale Capital from which distributions to creditors will be made pursuant to the Plan.

"**Escrow Agent**" means Regions Bank.

"**Escrow Agreement**" means that certain agreement by and between the Debtor, Whale Capital, LP and Stryker Corporation.

"**Estate**" means the estate created upon the commencement of the Bankruptcy Case by section 541 of the Bankruptcy Code.

"**Exit Financing**" means that certain transaction whereby Whale Capital LP has funded the sum of $4,250,000.00 to be used as the primary means of implementation of the Plan.

"**Fee Application**" means an application of a Professional under section 330, 331, 503, 506, or 1129(a)(4) of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Bankruptcy Cases.

"**File**" or "**Filed**" means file or filed with the Bankruptcy Court in the Bankruptcy Cases.

"**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022 as applied to the Bankruptcy Case.

"**Final Order**" or "**Final Judgment**" means (a) an order or judgment of a court of competent jurisdiction as to which the time to appeal, file a writ of mandamus, petition for certiorari or move for re-argument, reconsideration, new trial or rehearing has expired and as to which no appeal, writ of mandamus, petition for certiorari or other proceeding for re-argument, reconsideration or rehearing shall then be pending; or (b) in the event that an appeal, writ of mandamus, petition for certiorari or motion for re-argument, reconsideration, new trial or rehearing has been sought with respect to an order or judgment, such order or judgment shall have been affirmed by the highest court to which such order or judgment may be appealed, and/or certiorari and mandamus shall have been denied and the time to take any further appeal, petition for writ of mandamus or certiorari or move for re-argument, reconsideration, new trial or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, as made applicable or as provided by any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order or Final Judgment.

"**General Unsecured Claim**" means an Unsecured Claim that is not (a) an Administrative Expense Claim, (b) a Professional Fee Claim, (c) or a Priority Unsecured Claim, and includes all other Claims not separately classified under the Plan.  General Unsecured Claims includes all other Claims not separately classified under the Plan or provided for in Article II.

"**General Unsecured Creditor(s)**" means an Entity that is a Holder of an Allowed General Unsecured Claim.

"**Governmental Authority**" means any court, tribunal, or governmental department, commission, board, bureau, agency or instrumentality of any nation or of any province, state, commonwealth, nation, territory, possession, county, parish, municipality, or other subdivision thereof, whether now or hereafter constituted or existing.

"**Holder**" and collectively, "**Holders**" mean a Person or Entity holding a Claim, and with respect to a vote on the Plan, means the beneficial Holder as of the Distribution record date or any authorized signatory who has completed and executed a Ballot in accordance with the Voting Instructions.

"**Impaired**" or "**Impairment**" has the meaning set forth in section 1124 of the Bankruptcy Code.

"**IRS**" shall mean the Internal Revenue Service.

"**Laws**" means all applicable statutes, laws, ordinances, regulations, orders, writs, injunctions or decrees of any state, commonwealth, nation, territory, possession, county, township, parish, municipality or Governmental Authority.

"**LDR**" shall mean the Louisiana Department of Revenue.

"**Lien**" means a lien, security interest, or other interest or encumbrance as defined in section 101(37) of the Bankruptcy Code asserted against any property of the Estate.

"**Person**" means a person as defined in section 101(41) of the Bankruptcy Code.

"**Petition**" means the voluntary petition filed by the Debtor on March 23, 2016 which initiated the bankruptcy case.

"**Petition Date**" means the date (March 23, 2016) and time at which the Debtor commenced the Bankruptcy Case.

"**Plan**" has the meaning set forth in the initial paragraph hereof.

"**Plan Documents**" means all of the agreements, instruments and documents necessary or appropriate to effectuate the terms and conditions of or transactions contemplated by the Plan.

"**Post-Effective Date Interest**" means interest on an Allowed Claim at the rate provided in the Plan subsequent to the Effective Date.

"**Post-Petition Date Interest**" means interest on an Allowed Claim at the rate provided in the Plan subsequent to the filing of the bankruptcy petition to the Effective Date.

"**Priority Unsecured Claims**" means any Claim against the Debtor entitled to priority in right of payment under sections 507(a)(3)-(8) of the Bankruptcy Code.

"**Professional**" means an Entity (a) employed in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) to whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4), 506, or 1129(a)(4) of the Bankruptcy Code.

"**Professional Fee Claim**" means those fees and expenses claimed by Professionals pursuant to sections 330, 331, 503, 506, and/or 1129(a)(4) of the Bankruptcy Code (including Lender Professional Fees and Expenses Claims), and unpaid as of the Confirmation Date.

"**Reorganized Debtor**" means the Debtor following the Effective Date.

"**Schedules**" means the respective schedules of assets and liabilities, the list of Interests, and the statements of financial affairs filed by the Debtor in accordance with section 521 of the Bankruptcy Code and the official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statement have been or may be supplemented or amended from time to time.

"**Secured Claim**" means a Claim against the Debtor that is secured by a validly perfected

Lien on collateral or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code.

"**Subsidiary**" means, for any Entity, any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Entities performing similar functions (including that of a general partner) are at the time directly or indirectly owned, collectively, by such Entity and any Subsidiaries of such Entity. The term Subsidiary shall include Subsidiaries of Subsidiaries (and so on).

"**Taxes**" means all taxes, assessments, filing or other fees, levies, imposts, duties, deductions, withholdings, stamp taxes, interest equalization taxes, capital transaction taxes, severance taxes, foreign exchange taxes or other charges, or other charges of any nature whatsoever, from time to time or at any time imposed by Law or any federal, state or local governmental agency, and "**Tax**" means any one of the foregoing.

"**Unimpaired**" has the meaning set forth in section 1124 of the Bankruptcy Code.

## ARTICLE II
## NON-CLASSIFIED CLAIMS AND CERTAIN FEES AND TAXES

Section 2.1     **Administrative Expense Claims**.

      **(a)**     **Allowed Administrative Expense Claims Against the Debtor**. Subject to the bar date provisions below, the Holders of Allowed Administrative Expense Claims against the Debtor, unless otherwise agreed to by the Debtor and the Holder(s) or set forth in the Plan, are entitled to priority under Section 507(a)(1) of the Bankruptcy Code. An Entity entitled to payment pursuant to Sections 546(c) or 553 of the Bankruptcy Code, and an Entity entitled to payment of administrative expenses pursuant to Sections 503 and 507(a) of the Bankruptcy Code, all via an Allowed Administrative Expense Claim, shall receive from the Reorganized Debtor, on account of such Allowed Administrative Expense Claim, payment in full, in Cash, after the latter of (i) the Effective Date, (ii) the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (iii) upon such other terms as may be agreed upon by the Holder of such Allowed Administrative Expense Claim and the Debtor or Reorganized Debtor, or (iv) as otherwise established pursuant to an order of the Bankruptcy Court; provided, however, that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors in accord with the terms and conditions of the particular transactions, the applicable non-bankruptcy law, and any agreements related thereto or any order of the Bankruptcy Court. For the avoidance of doubt, the Debtor's personal living expenses (e.g. food and dining expenses, utilities, home maintenance and other daily living expenses) as more particularly provided and as approved the Bankruptcy Court in the Debtor's Post-Petition Monthly Budget shall be considered liabilities incurred in the ordinary course of his business as an individual debtor. All claimants who must file a motion for allowance of an Administrative Expense Claim must do so by the 30th day following the

Effective Date or be forever barred from such claims; applications for Professional Fee Claims are addressed below.

(b) **Bar Date for Filing Applications for Allowance and Payment of Administrative Expense Claims**. Except as provided by 11 U.S.C. §503(b)(1)(D), applications for allowance and payment of Administrative Expense Claims must be filed on or within thirty (30) days after the Effective Date. The Court shall not consider any applications for the allowance of an Administrative Expense Claim filed after such date, and any such Administrative Expense Claim shall be discharged and forever barred. Any Administrative Expense Claim that becomes an Allowed Administrative Expense Claim after the Confirmation Date will be treated like other Allowed Administrative Expense Claims and will be paid pursuant to Article II, Sections 2.1(a) and (b) above. Any such Claim that is Allowed, but determined not to be an Administrative Expense Claim, will be treated as a Class 11 General Unsecured Claim. Debtor reserves the right to file objections to any claims seeking Administrative Claim status under any source including but not limited to 11 U.S.C. §503(b)(1)(D), this section and/or Section 3.3. below. As soon as reasonably practicable, but in no event later than ninety (90) days after the Effective Date or thirty (30) days after the filing of the Administrative Expense Claim at issue, whichever comes later, unless otherwise ordered by the Bankruptcy Court (which may be ordered upon *ex parte* motion of the Reorganized Debtor), all of Debtor's or Reorganized Debtor's objections to Administrative Expense Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims. An objection shall notify the Holder of the Claim of the deadline for responding to such objection. Except as otherwise agreed by the Debtor or after the Effective Date, the Reorganized Debtor and the Holder of the objected-to Claim or unless an order enlarging the time period for same is requested by the responding creditor within thirty (30) days after service of an objection, and such request is granted by the Court, any written response to the objection must be filed with the Bankruptcy Court by the Holder of the objected-to Claim and must be served upon the Debtor or, after the Effective Date, the Reorganized Debtor and upon counsel to the Debtor or Reorganized Debtor, as the case may be within thirty (30) days after service of the objection. Failure to file a written response in accordance with this provision shall constitute a waiver and release of the subject Claim, and shall cause the Bankruptcy Court to enter a default judgment against the non-responding Holder of the Claim granting the relief requested in the objection.

Any Allowed Administrative Expense Claim, to the extent such Claim qualifies as an Administrative Expense Claim pursuant to 11 U.S.C. § 503(b)(1)(B), will accrue interest until paid as provided pursuant to non-bankruptcy law.

Section 2.2 **Professional Fee Claims**.

(a) **Allowed Professional Fee Claims Against the Debtor**. Except as otherwise provided in the Plan or otherwise agreed to by the Debtor or, after the Effective Date, the Reorganized Debtor and such Holder, each Holder of an Allowed Professional Fee Claim shall receive from the Reorganized Debtor, on account of such Allowed Professional Fee Claim, Cash pursuant to Sections 2.1(a). Unless otherwise provided herein or otherwise agreed to by

11

the Debtor or, after the Effective Date, the Reorganized Debtor and such Holder, all secured creditors' Professional Fee Claims shall be subject to section 506(b) of the Bankruptcy Code.

**(b)** **Bar Date for Filing Applications for Allowance and Payment of Professional Fee Claims Against the Debtor.** Except as otherwise provided for in the Plan, applications for allowance and payment of Professional Fee Claims (including Professional Fee Claims that are part of a Claim for Applicable Fees and Costs) incurred on or before the Confirmation Date must be filed on or within sixty (60) days after the Effective Date. The Bankruptcy Court shall not consider any applications for the allowance of a Professional Fee Claim filed after such date, and any such Professional Fee Claim shall be discharged and forever barred.

Section 2.3 **U.S. Trustee's Fees**. The Debtor will continue to report to the U.S. Trustee by the twentieth (20th) of each month the total disbursements of the Debtor for the previous month and shall timely pay quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until the Bankruptcy Court enters a Final Decree or an order either converting the Bankruptcy Case to cases under Chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case Any such fees outstanding and due as of the Effective Date shall be paid in Cash by the Debtor or Reorganized Debtor on the Effective Date.

## ARTICLE III
## CLASSIFICATION OF CLAIMS; BAR DATE

Section 3.1 **Classification**. Pursuant to section 1122 of the Bankruptcy Code, a Claim is placed in a particular Class for purposes of voting on the Plan and receiving Distributions under the Plan only to the extent (i) the Claim is an Allowed Claim in that Class, and (ii) the Claim has not been paid, released, or otherwise compromised before the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Professional Fee Claims specified in section 507(a)(2) of the Bankruptcy Code are not classified under the Plan.

Section 3.2 **Identification of Classes**. Identification of Classes. The following are the designations for the Classes of Claims against the Debtor:

| Class 1-Unsecured Priority Claims | Unimpaired | All Allowed Unsecured Priority Claims |
|---|---|---|
| Class 2 – Whitney Bank(a/k/a Hancock Bank) | Impaired | All Allowed Secured Claims of Whitney Bank (a/k/a Hancock Bank). |
| Class 3 – Ally Bank | Impaired | All Allowed Secured Claims of Ally Bank. |

12

| Class 4 – JP Morgan Chase Bank, N.A. | Impaired | All Allowed Secured Claims of JP Morgan Chase Bank N.A. |
|---|---|---|
| Class 5 – Ford Motor Credit Company | Impaired | All Allowed Secured Claims of Ford Motor Credit Company. |
| Class 6 – Khoury & Vogt Architects, P.A. | Impaired | All Allowed Secured Claims of Khoury & Vogt Architects, P.A. |
| Class 7 - M & T Bank | Impaired | All Allowed Secured Claims of M & T Bank. |
| Class 8 – US Bank National Association | Impaired | All Allowed Secured Claims of U.S. Bank National Association. |
| Class 9 – Stryker Corporation and Howmedica Osteonics, Corp Claims | Impaired | All Allowed Unsecured Claims of Stryker Corporation and Howmedica Osteonics Corp. |
| Class 10 – July 29, 2016 Unsecured Claims | Impaired | All Allowed July 29, 2016 Unsecured Claims. |
| Class 11-General Unsecured Claims | Impaired | All Allowed General Unsecured Claims. |

Section 3.3 **Claims Bar Date**. Except as otherwise provided herein, in the Bankruptcy Code, in the Bankruptcy Rules, or by order of the Bankruptcy Court, all Claims must be filed with the Bankruptcy Court on or before July 29, 2016, except for governmental units, which must file proofs of claim with the Bankruptcy Court no later than September 19, 2016 [see Docket entry 82]; a copy of the order setting these bar dates is attached hereto as Exhibit E; provided that, in accordance with Section 2.1(b), Claims for Administrative Expense Claims must be filed within thirty (30) days after the Effective Date, except as otherwise provided herein, and in accordance with Section 2.2(b), Claims for Applicable Fees and Costs (including Professional Fee Claims) must be filed within sixty (60) days after the Effective Date except as otherwise provided herein. The Bankruptcy Court shall not consider any Claim filed after such dates, and any such Claim shall be discharged and forever barred.

## ARTICLE IV
## IMPAIRMENT AND VOTING OF CLASSES; TREATMENT OF CLASSES

Section 4.1 **Class 1 – Allowed Unsecured Priority Tax Claims**

**Impairment and Voting**. The Claims in Class 1 are Unimpaired. Subject to the terms and conditions of the Plan, the Holder of Allowed Priority Claims in Class 1 are presumed to accept.

**(a) Unsecured Priority Tax Claims of the IRS**

Subject to the right of the Debtor and/or Reorganized Debtor to dispute any Unsecured Priority Tax Claim of the IRS, including but not limited to filing objections or adversary

13

proceeding thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, on the Effective Date, the Debtor and/or Reorganized Debtor will set aside funds from the $4,250,000.00 exit financing loan from Whale Capital L.P. sufficient to satisfy the $369,571.13 asserted unsecured priority claim of the IRS, to the extent it is Allowed. Debtor intends to object to the allowance of the IRS' proof of claim no. 1-2. In the event that those funds are not available, the Debtor and/or Reorganized Debtor will pay the IRS' unsecured priority claim beginning within sixty (60) days of the Effective Date pursuant to 11 U.S.C. § 1129(a)(9)(c)(ii), and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor shall pay such Holder in Cash as follows: (x) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, including interest and penalties[1], over a period not later than five (5) years after the date of the Order of Relief. The estimated funds available for Allowed Class 1 claims of the IRS on a monthly bases is Six Thousand Seven Hundred Twenty-Four Dollars and 00/100 ($6,724.00) per month over a period ending not later than five (5) years after the date of the order for relief. Notwithstanding the foregoing, the Debtor and/or the Reorganized Debtor and related parties may, in its sole discretion and without any penalty, pay any amount required or allowed to be paid under this Section before it is due.

The Debtor and/or Reorganized Debtor reserve their rights to have any of its members and/or insiders to remit any payments to Allowed Class 1 Claims of the IRS, including all applicable interest at the rate set forth in IRC §6621 from the confirmation of the Plan.

If an objection is pending before the Effective Date, the aforementioned funds or disputed portion thereof shall be held in the Escrow Account pending resolution of the objection. In the event that the objection is resolved in favor of the IRS, the funds held in the Escrow Account attributable to the IRS Unsecured Priority Tax Claim or any portion thereof shall be distributed to the IRS along with interest at the rate set forth in IRC §6621 for the calendar month the Plan is confirmed. Post-Petition Date Interest shall be paid until such time as the funds are released. In the event the objection is resolved in favor of the Debtor and/or Reorganized Debtor, the funds held in the Escrow Account attributable to the IRS Unsecured Priority Tax Claim or any portion thereof shall be retained by the Debtor or Reorganized Debtor in the Escrow Account and disbursed in accordance with the terms and provisions provided by the Escrow Agreement and the Plan.

If an objection is filed after the Effective Date and sustained by the Bankruptcy Court, the relevant funds shall be returned to the Reorganized Debtor by the IRS within ninety (90) days of entry of a final order.

---

[1] The interest on the Allowed Priority Unsecured Claims of the IRS shall be paid at the interest rate described in 26 U.S.C. §§ 6621 and 6622.

The Debtor and the Reorganized Debtor shall retain any and all rights related to the utilization of any net operating losses, ordinary losses, credits, deductions, net losses, offsets and/or setoffs.  The Debtor and Reorganized Debtor will be bound by all time frames and requirements of such claims as set forth in the Internal Revenue Code.  Any such claim is subject to the review of the IRS' Examination Department.

### (b)        Unsecured Priority Tax Claims of the LDR

Subject to the right of the Debtor and/or Reorganized Debtor to dispute any Unsecured Priority Tax Claim of the LDR, including but not limited to filing objections or adversary proceedings thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, on the Effective Date, the Debtor and/or Reorganized Debtor will set aside funds from the $4,250,000 exit financing loan from Whale Capital L.P. sufficient to satisfy the $23,285.85 unsecured priority claim of the LDR, to the extent it is Allowed.  Debtor intends to object to the allowance of LDR's proof of claim no. 18-1.  In the event that those funds are not available, the Debtor and/or Reorganized Debtor will pay the LDR's Allowed unsecured priority claim beginning on the Effective Date, unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor shall pay such Holder in Cash as follows: (x) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, including interest and penalties[2], over a period not later than five (5) years after the date of the Order of Relief; without prejudice to the rights of the Debtor\Reorganized Debtor described in the following sentence, Debtor\Reorganized Debtor shall pay any such outstanding amount with equal, pro-rata installments, each month during this period.  Notwithstanding the foregoing, the Reorganized Debtor and related parties may, in its sole discretion and without any penalty, pay any amount required or allowed to be paid under this Section before it is due.

The Debtor and/or Reorganized Debtor reserve their rights to have any of its members and/or insiders to remit any payments to Class 1 including all applicable interest.

If an objection is pending before the Effective Date, the aforementioned funds or disputed portion thereof shall be held in the Escrow Account pending resolution of the objection.  In the event that the objection is resolved in favor of the LDR, the funds held in the Escrow Account attributable to the LDR Unsecured Priority Tax Claim or any portion thereof shall be distributed to the LDR along with interest at the rate of 7.0% A.P.R.  Post-Petition Date Interest shall be paid until such time as the funds are released. In the event the objection is resolved in favor of the Debtor and/or Reorganized Debtor, the funds held in Escrow Account attributable to the LDR Unsecured Priority Tax Claim or any portion thereof shall be retained by the Debtor or Reorganized Debtor in the Escrow Account and disbursed in accordance with the terms and provisions provided by the Escrow Agreement and the Plan.

---

[2] The interest on the Allowed Priority Unsecured Claims of the LDR shall be paid at a rate of 7.0% per annum.

If an objection is filed after the Effective Date and sustained by the Bankruptcy Court, the relevant funds shall be returned to the Reorganized Debtor by the LDR within thirty (30) days of entry of a final order.

The Debtor and the Reorganized Debtor shall retain any and all rights related to the utilization of any net operating losses, ordinary losses, credits, deductions, net losses, offsets and/or setoffs.

### (c) Unsecured Priority Tax Claims of Patrick Pilcher – Walton County Property Taxes ("WC")

Subject to the right of the Debtor and/or Reorganized Debtor to dispute any Unsecured Priority Tax Claim of WC, including but not limited to filing objections or adversary proceedings thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, on the Effective Date, the Debtor and/or Reorganized Debtor will set aside funds from the $4,250,000.00 exit financing loan from Whale Capital L.P. sufficient to satisfy the $12,180.43 unsecured priority claim of the WC, to the extent it is Allowed. Debtor does not intend to object to WC's Claim. In the event that those funds are not available, the Debtor and/or Reorganized Debtor will pay the WC's Allowed unsecured priority claim beginning on the Effective Date, unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor shall pay such Holder in Cash as follows: (x) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, including interest and penalties (interest shall accrue at 1.5% per month) over a period not later than five (5) years after the date of the Order of Relief. Notwithstanding the foregoing, the Reorganized Debtor and related parties may, in its sole discretion and without any penalty, pay any amount required or allowed to be paid under this Section before it is due. The Debtor and the Reorganized Debtor shall retain any and all rights related to the utilization of any net operating losses, ordinary losses, credits, deductions, net losses, offsets and/or setoffs.

The Debtor and/or Reorganized Debtor reserve their rights to have any of its members and/or insiders to remit any payments to Class 1 including all applicable interest.

If an objection is pending before the Effective Date, the aforementioned funds or disputed portion thereof shall be held in the Escrow Account pending resolution of the objection. In the event that the objection is resolved in favor of WC, the funds held in the Escrow Account attributable to the WC Unsecured Priority Tax Claim or any portion thereof shall be distributed to the WC along with interest at the rate of 1.5% per month. Post-Petition Date Interest shall be paid until such time as the funds are released. In the event the objection is resolved in favor of the Debtor and/or Reorganized Debtor, the funds held in Escrow Account attributable to the WC Unsecured Priority Tax Claim or any portion thereof shall be retained by the Debtor or Reorganized Debtor in the Escrow Account and disbursed in accordance with the terms and provisions provided by the Escrow Agreement and the Plan.

If an objection is filed after the Effective Date and sustained by the Bankruptcy Court, the relevant funds shall be returned to the Reorganized Debtor by WC within thirty (30) days of entry of a final order.

### (d)  Unsecured Priority Tax Claims of Jefferson Parish

The Debtor's Amended Schedules, Docket No. 88 at 23, also list an unsecured priority tax Claim in the amount of $13,639.61 on behalf of Jefferson Parish. However, per the June 3, 2016, Order of the Bankruptcy Court, Docket No. 66, the Debtor previously paid $14,333.59 to Whitney Bank, which in turn paid those property taxes previously scheduled as due to Jefferson Parish, Louisiana. The Jefferson Parish Sheriff's Office has provided the attached proof of said payment. *See* Exhibit C.  Thus, no further payment on this Claim is necessary.  The Debtor and the Reorganized Debtor shall retain any and all rights related to the utilization of any net operating losses, ordinary losses, credits, deductions, net losses, offsets and/or setoffs.

### Section 4.2  Class 2- Allowed Secured Claims of Whitney Bank (a/k/a Hancock Bank)

**Impairment and Voting**  The Claims in Class 2 are Impaired.  Subject to the terms and conditions of the Plan, the Holder of the Allowed Secured Claim of Whitney Bank (a/k/a Hancock Bank) in Class 2 is entitled to vote to accept or reject the Plan.  Value of Debtor's assets secured by Whitney Bank's security interest per the value shown on Debtor's Fifth Amended Schedules [Doc No. 152].

| Asset | Value Listed |
|---|---|
| 579 Woodvine Avenue Metairie, Louisiana 70005 | $2,500,000.00 |
| Lot 4, Blk. NN, Alys Beach Phase 2B, 23 La Garza Ct. Panama City Beach, Florida 32413 | $2,200,000.00 |
| Lot 31, Blk. B Ft. Beauregard Chalmette, Louisiana | $  250,000.0 |

Whitney Loans and Mortgages

The Debtor's indebtedness to Whitney is evidenced by, among other things, the following:

1. Promissory Note by Debtor dated July 28, 2014 in the original principal amount of $400,000.00 (Loan no. 1432816799)("Note 1");

2. Home Equity Line of Credit Agreement by Debtor and Stephanie Stone Ridgeway dated July 28, 2014 in the original principal sum of $1,100,000.00 (Loan no. 12009973702)("Note 2");

3. Promissory Note by Debtor and Stephanie Stone Ridgeway dated February 14, 2014 in the original principal sum of $820,000.00 (Loan no. 12009763749)("Note 3");

4. Preferred Line of Credit Agreement and Overdraft Protection Service Addendum Credit by Debtor dated April 25, 2014 in the original principal sum of $150,000.00 (Loan no. 12009885591)("Note 4"); and

5. Promissory Note by Stone Surgical, LLC dated April 3, 2015 in the original principal sum of $250,000.00 (Loan no. 66000181529)("Note 5") and Commercial Guaranty by Debtor of the indebtedness of Stone Surgical, LLC dated April 3, 2015 and.

The Debtor's indebtedness to Whitney is secured by, among other things, the following:

1. Mortgage by Debtor and Stephanie Stone Ridgeway dated July 28, 2014, recorded in the Parish of Jefferson, State of Louisiana in MOB 4622, Page 792 as number 11431034 against the property described as Lot 22-A, Square K, Metairie Club Gardens, bearing municipal number 579 Woodvine Avenue, Metairie, Louisiana 70005 ("Fannie Mae Mortgage");

2. Home Equity Mortgage by Debtor and Stephanie Stone Ridgeway dated July 28, 2014, recorded in the Parish of Jefferson, State of Louisiana in MOB 4622, Page 794 as number 11431037 against the property described as Lot 22-A, Square K, Metairie Club Gardens, bearing municipal number 579 Woodvine Avenue, Metairie, Louisiana 70005 ("Woodvine Second Mortgage");

3. Mortgage by Debtor and Stephanie Stone Ridgeway dated February 14, 2014, filed in the official records of the County of Walton, State of Florida in CFN 1270916 or Bk. 2943, Pg. 291 on a certain piece of immovable property more particularly described as Lot 4, Blk. NN, Alys Beach, Phase 2B, Panama City Beach, Florida, bearing municipal number 23 La Garza Ct. ("Florida Mortgage"); and

4. Multiple Indebtedness Mortgage by Stone Surgical, LLC, Debtor and Stephanie Stone Ridgeway dated April 3, 2015, recorded in the Parish of St. Bernard at File No. 590691, MOB 1764, Page 334, against property described as Lot 31, Block B, Fort Beauregard Marina Estates, bearing municipal number 2556 Fort Beauregard, St. Bernard Parish, Louisiana ("St. Bernard Mortgage").

Whitney's claim is Allowed in the following amounts as of January 31, 2017:

Note 1:
Principal:  $359,064.66
Interest:  $6,807.41
NSF Fee: $20.00
Recording Fee: $26.00
Late Charges: $140.53
Total:  $366,058.60


Note 2:
Principal: $1,100,000.00
Interest: $20,987.41
Late Charge: $90.00
Total:  $1,121,077.41


Note 3:
Principal:  $820,000.00
Interest:  $23,333.08
Total:  $843,333.08

Note 4:
Principal: $149,755.38
Interest: $4,461.87
Late Charge: $80.00
Total: $154,297.25

Note 5:
Principal: $225,862.49
Interest: $7,974.55
Total: $233,837.04

Total principal and interest owed on Notes 1-5 as of January 31, 2017:  2,718,246.85


Plus interest and other amounts continuing to accrue on and after January 31, 2017 until paid in full; Plus attorneys' fees and costs in the amount of $50,105.13 as of January 31, 2017 and continuing to accrue thereafter.

**Treatment.**   On the Effective Date, Debtor and/or Reorganized Debtor will pay (i) all accrued interest and reasonable attorneys' fees and costs owing on Note 1, Note 2, Note 3, Note 4 and Note 5 (collectively, "Notes"), plus (ii) an additional $150,000.00 to reduce the principal amount owed on Note 5, (iii) plus pasted due principal installments owing on Note 1.  The obligations described in this paragraph are not subject to Section 2.2 of the Plan.

On the Effective Date, Debtor and/or Reorganized Debtor will execute a new note ("New Note 1") to replace Note 1 which shall contain the same amounts and terms as Note 1. New Note 1 will continue to be secured by the Fannie Mae Mortgage.

On the Effective Date, Debtor and/or Reorganized Debtor, Stephanie Stone Ridgeway, and Stone Surgical, LLC will execute a promissory note ("Consolidated Note") for the amounts due under Note 2, Note 3, Note 4 and Note 5. Debtor and/or Reorganized Debtor, Stephanie Stone Ridgeway, and Stone Surgical, LLC will each be liable *in solido*, for all amounts due under the Consolidated Note. As more fully set forth therein, the Consolidated Note will be payable in monthly installments of principal and interest based upon a 15 year amortization, bear interest at 5.00% per annum, and mature on September 30, 2019.

Debtor and/or Reorganized Debtor estimates that the monthly payments for New Note 1 shall be approximately $2,811.00 and that the monthly payments for Consolidated Note shall be approximately $16,967.00.

As more fully set forth therein, the Consolidated Note contains standard events of default and will additionally contain an event of default if the properties secured by the Florida Mortgage and the St. Bernard Mortgage are not sold by May 31, 2017 with the proceeds from such sales (less broker's commissions) being applied to the indebtedness owed under the Consolidated Note. If the properties secured by the Florida Mortgage and the St. Bernard Mortgage are not sold by May 31, 2017 as set forth above, the Debtor and Reorganized Debtor shall be in default under this Plan, and Whitney shall be entitled to immediately foreclose on the properties secured by the Florida Mortgage and the St. Bernard Mortgage and pursue any and all rights and remedies pursuant to the New Note, Consolidated Note, the mortgages securing same and this Plan, any and all related loan and security documents and/or state law without notice of any kind and without having to obtain relief from the stay and/or relief from the post confirmation injunction and without having to obtain any other relief or order of the Bankruptcy Court. This sales schedule is designed in conjunction with the relief requested from the Bankruptcy Court by the Debtor and/or Reorganized Debtor through his *Motion and Incorporated Memorandum for Authority for Extension of Time Pursuant to 11 U.S.C. §§ 105,108(a)(b), Alternatively Pursuant to 11 U.S.C. § 365 Within Which Debtor Should Commence an Action, and for Related Interim Relief* [Docket No. 317], through which the Debtor prays for an order extending any deadlines provided for in the Deed, Purchase and Sale Agreement, Declarations and Amended Declarations related to the Required Commencment Date (all terms defined in that motion), from February 14, 2017, through May 31, 2017, including but not limited to deadlines to begin construction of a single family residence on the lot subject to the Florida Mortgage by the Required Commencement Date, and diligently pursing construction thereafter until completion, including landscaping. The Debtor and Reorganized Debtor intend to sell the property secured by the Florida Mortgage before May 31, 2017 so that a purchaser may timely commence construction.

Upon an event of default on and after the Effective Date, Whitney shall be entitled to pursue any and all rights and remedies pursuant to the New Note, Consolidated Note, the mortgages securing same, any and all related loan and security documents and/or state law without notice of any kind and without having to obtain relief from the stay and/or relief from the post confirmation injunction and without having to obtain any other relief or order of the Bankruptcy Court.

The Consolidated Note will be secured by the Woodvine Second Mortgage, the Florida Mortgage, and the St. Bernard Mortgage and any other security interests and liens currently securing any one or more of the Notes. Prior to the Effective Date, the Debtor, Stephanie Stone Ridgeway, and Stone Surgical, LLC agree to execute such additional documents as may be reasonably requested by Whitney to reflect the terms of the Plan, including without limitation amendments to the Fannie Mae Mortgage, the Woodvine Second Mortgage, the Florida Mortgage, and the St. Bernard Mortgage (collectively, "Whitney Mortgages"). The Whitney Mortgages are recognized as properly perfected and first ranking mortgages superior in rank and priority to any other mortgage or liens. The terms of the Confirmation Order shall be in form and substance consistent with the terms of the Plan and be acceptable to the Debtor and/or Reorganized Debtor and Whitney.

In connection with the terms of this Plan and the documents referenced herein, Whitney shall not be required to provide Debtor any notices or other accommodations which may be otherwise required under any federal or state law.

Upon confirmation of the Plan, the Debtor shall be deemed to have fully released and forever discharged Whitney, and its past and present parents, affiliates, subsidiaries, officers, directors, attorneys, agents, employees, insurers, reinsurers, representatives, shareholders, successors and assigns from any and all claims, demands, damages, actions, causes of action, or sums of money, of whatever kind or nature, whether known or unknown, that the Debtor has or may have against Whitney relating to this bankruptcy case, the indebtedness set forth in its proof of claim filed in this bankruptcy case, the mortgages and other security interests securing such indebtedness, and any and all actions and inactions in any way relating to the foregoing or any right or claim under the Bankruptcy Code.

Notwithstanding any other provisions herein, the obligations of Debtor to Whitney, and Whitney's rights and interests with respect to Debtor and his properties, are governed by this specific section of the Plan and the loan and security documents referenced herein, and are not modified by general sections of the Plan, including without limitation sections 5.5, 7.4, 7.9, 8.4, 8.5, 8.6, 8.7, 8.8, 8.9, 8.10, 10.1, 10.3, 10.4, 10.6, 10.7, 12.1, 13.2, 13.4, 13.7, and 14.1 and Section VIII(C)(7) of the Disclosure Statement.

**Cure of Defaults**.  On the Effective Date, all defaults that have or could have arisen before the Effective Date under the all loan documents forming a basis of Whitney Bank's Allowed Secured Claim against the Debtor shall be deemed cured.

Section 4.3     **Class 3 – Allowed Secured Claims of Ally Bank**

**Impairment and Voting**.  The Claim in Class 3 is Impaired.  Subject to the terms and conditions of the Plan, the Holder of the Allowed Secured Claim of Ally Bank in Class 3 is entitled to vote to accept or reject the Plan.  Value of Debtor's assets secured by Ally Bank's security interest per the value shown on Debtor's Fifth Amended Schedules [Doc No. 152].

| Asset | Value Listed |
|---|---|
| 2015 GMC Yukon SUV VIN 1GKS2CKJ6FR139584 | $46,500.00 |

**Treatment.**  Subject to the right of the Debtor and/or Reorganized Debtor to dispute any Ally Bank Secured Claim, including but not limited to filing objections or adversary proceedings thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, on the Effective Date, the Reorganized Debtor will set aside funds from sale and/or trade-in of the 2015 GMC Yukon and/or the Covey Rise Lot Sale ($101,100), 2011 Toyota Highlander Sale ($22,500), and the 2008 GMC Yukon Sale, ($18,500) (terms defined below) sufficient to satisfy the $45,620.85 asserted secured Claim of Ally Bank, to the extent it is Allowed, with excess funds, if any, to be deposited in the Escrow Account to pay Allowed Claims pursuant to the terms and provisions of the Plan and/or return to Whale Capital, L.P. toward payment of the Exit Financing as circumstances direct.  On the Effective Date, the Reorganized Debtor will also set aside funds from those same sources to pay Ally Bank Post-Petition Date interest from the Petition Date to the Effective Date, at its non-default contract rate of interest, which Debtor asserts is a monthly pro rata portion of 4.49% A.P.R., simple interest.[3]  Payment of Ally Bank's Allowed Secured Claim plus accrued interest shall be made on or before ten (10) business days after the Effective Date.

In the event that the referenced funds are not available on the Effective Date, the Reorganized Debtor shall pay Ally Bank in Cash as follows: a monthly contractual payment with interest equal to its non-default contract rate of interest.  This payment will continue until Ally Bank is paid the full amount of its Allowed Secured Claim and the Post-Petition Date interest outlined above.

---

[3] Upon Confirmation of this Plan, 4.49% A.P.R. shall be the presumed correct interest rate for purposes of interest payments described for this Class.

Should the Holder of the Allowed Claim in Class 3 receive said payments in full, it will accept this in full satisfaction of all Claims, including any and all post-petition claims against Debtor and/or Reorganized Debtor; and it will release its lien on its collateral, the GMC Yukon SUV 2015, VIN. 1GKS2CKJ6FR139584.  Except as provided in this paragraph, Ally Bank's loan documentation supporting its Allowed Claim, and any lien it possesses regarding the GMC Yukon SUV 2015, VIN. 1GKS2CKJ6FR139584 is preserved and shall not be novated by this Plan and said documents shall remain in full force and effect to the extent not modified by this Plan.  Such documents and liens shall be unaffected by the Plan, Confirmation, the Confirmation Order and Consummation and shall maintain the same validity, priority, and extent that existed on the Petition Date and shall secure payment of any and all obligations due unto the Holder of the Allowed Claim in Class 3, under this Plan, until the Allowed Secured Claim in Class 3 is paid.

Debtor and/or Reorganized Debtor may at any time make full or partial payments toward the amount of  the Allowed Secured Claim of the Holder of the Allowed Claim in Class 3, plus all Post-Petition Date interest if any, still due and outstanding under the terms outlined above, from surplus funds if they are available, and if the Reorganized Debtor, in the exercise of his business judgment, believes such a payment will not jeopardize the Reorganized Debtor's ability to make other required Plan payments.

Section 4.4     **Class 4 – Allowed Secured Claims of J.P. Morgan Chase Bank, N.A.**

**Impairment and Voting.**  The Claim in Class 4 is Impaired.  Subject to the terms and conditions of the Plan, the Holder of the Allowed J.P. Morgan Chase Bank Secured Claim in Class 4 is entitled to vote to accept or reject the Plan.  Value of Debtor's assets secured by J.P. Morgan Chase Bank's security interest per the value shown on Debtor's Fifth Amended Schedules [Doc. No. 152].

| Asset | Value Listed |
|---|---|
| 2016 Mercedes S63 VIN  WDDUG7JB5GA219374 | $150,000.00 |

**Treatment.**  Subject to the right of the Debtor and/or Reorganized Debtor to dispute any J.P. Morgan Chase Bank Secured Claim, including but not limited to filing objections or adversary proceedings thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor shall pay such Holder in Cash as follows: a monthly payment of Post-Effective Date interest equal to the monthly pro rata portion of either its non-default contract rate of interest, which Debtor asserts is a monthly pro rata portion of 3.99% A.P.R., simple interest, or the monthly pro rata portion of 5.5% A.P.R. simple interest, representing the Prime Rate, plus two percent, interest, whichever is

23

less[4].  J.P. Morgan Chase Bank shall receive this payment every month following the Effective Date in which it is not paid the full amount of its Allowed Secured Claim. Debtor intends to sell and/or trade-in the collateral which J.P. Morgan Chase Bank asserts secures its Claim, for the highest reasonable market value available in order to use the value realized to pay the Allowed Secured Claim of J.P. Morgan Chase Bank. This collateral is a vehicle - a Mercedes S63, 2016 VIN. WDDUG7JB5GA219374.  Should J.P. Morgan Chase Bank receive the full amount of its Allowed Secured Claim and the Post-Effective Date interest described under this Plan through the trade in or sale of the Mercedes S63, it will accept this in full satisfaction of all Claims, including any and all post-petition claims against the Debtor and/or the Reorganized Debtor. Should the amount be insufficient to fully satisfy the Allowed Claim of J.P. Morgan Chase Bank plus Post-Effective Date interest described herein, any deficiency shall be treated pursuant to the terms of Class 11 below. The debt owed to J.P. Morgan Chase Bank will not accrue any interest from the date of the filing of the bankruptcy until the Effective Date, and the debt will not have accrued any late fees, default interest or penalties beyond any such amounts included in the Allowed Secured Claim or amounts accruing as Post-Effective Date interest as outlined above. Except as otherwise provided in this paragraph, J.P. Morgan Chase Bank's loan documentation supporting its Allowed Claim, and any lien it possesses regarding the Mercedes S63, 2016, VIN. WDDUG7JB5GA219374, is preserved and shall not be novated by this Plan and said documents shall remain in full force and effect to the extent not modified by this Plan.  Such documents and liens shall be unaffected by the Plan, Confirmation, the Confirmation Order and Consummation and shall maintain the same validity, priority, and extent that existed on the Petition Date and shall secure payment of any and all obligations due unto J.P. Morgan Chase Bank under this Plan until J.P. Morgan Chase Bank's Allowed Secured Claim is paid and or satisfied.  J.P. Morgan Chase Bank shall forebear from foreclosing on its collateral for at least eleven months beyond the Effective Date, but shall thereafter reserve the right to exercise any and all rights it may have towards its collateral, or, at its option, renegotiate a revised, renewed payment agreement with the Reorganized Debtor if it has not yet been paid the Allowed amount of its Secured Claim. The Reorganized Debtor retains the right to renegotiate a revised payment plan with J.P. Morgan Chase Bank.

Debtor and/or Reorganized Debtor may at any time make full or partial payments toward the amount of J.P. Morgan Chase Bank's Allowed Secured Claim, plus all Post-Effective Date interest if any, still due and outstanding under the terms outlined above, from surplus funds if they are available, and if the Reorganized Debtor, in the exercise of his business judgment, believes such a payment will not jeopardize the Reorganized Debtor's ability to make other required Plan payments.

---

[4] Upon Confirmation of this Plan, 3.99% A.P.R. shall be the presumed correct interest rate for purposes of interest payments described for this Class.

Section 4.5    **Class 5 – Allowed Secured Claims of Ford Motor Credit Company**

**Impairment and Voting**.  The Claim in Class 5 is Impaired.  Subject to the terms and conditions of the Plan, the Holder of the Allowed Ford Motor Credit Company Secured Claim in Class 4 is entitled to vote to accept or reject the Plan.  Value of Debtor's assets secured by Ford Motor Credit's security interest per the value shown on Debtor's Fifth Amended Schedules [Doc. No. 152].

| Asset | Value Listed |
|---|---|
| 2015 Ford F350 VIN 1FTW3DTXFEB35540 | $50,000.00 |

**Treatment**.  Subject to the right of the Debtor and/or Reorganized Debtor to dispute any Ford Motor Credit Company ("FMC" or "Holder") Secured Claim, including but not limited to filing objections or adversary proceedings thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor will set aside on the Effective Date funds from either the sale and/or trade-in of FMC's collateral, 2015 Ford F350, VIN. 1FT8W3DTXFEB35540, and or the Covey Rise Lot Sale ($101,100), 2011 Toyota Highlander Sale ($22,500), and the 2008 GMC Yukon Sale, ($18,500) sufficient to satisfy the $17,376.97 asserted secured Claim of FMC, to the extent it is Allowed with excess funds, if any, to be deposited in the Escrow Account to pay Allowed Claims pursuant to the terms and provisions of the Plan and/or return to Whale Capital, L.P. toward payment of the Exit Financing as circumstances direct.  On the Effective Date, the Reorganized Debtor will also set aside funds from those same sources to pay FMC Post-Petition Date interest from the Petition Date to the Effective Date, at FMC's non-default contract rate of interest of 5.99% [5].  Payment of FMC's Allowed Secured Claim plus accrued interest shall be made on or before ten (10) business days after the Effective Date.  In the event that the referenced funds are not available on the Effective Date, the Reorganized Debtor shall pay FMC in Cash as follows: a monthly contractual payment with interest equal to its non-default contract rate of interest.  This payment will continue until FMC is paid the full amount of its Allowed Secured Claim and the Post-Petition Date interest outlined above; should FMC receive said payments in full, it will accept this in full satisfaction of all Claims, including any and all post-petition claims against Debtor and/or Reorganized Debtor; upon payment of its Allowed secured claim, FMC will release its lien on its collateral, the 2015 Ford F350[6], VIN. 1FT8W3DTXFEB35540.  The debt will not have accrued any late fees, default interest or penalties beyond any such amounts described in this paragraph.

---

[5] Upon Confirmation of this Plan, 5.99% shall be the presumed correct interest rate for purposes of interest payments for this Class.
[6] See reference to status of Ford F350 as set forth in Article IV Section 12 of the Amended Disclosure Statement.

Debtor and/or Reorganized Debtor may at any time make full or partial payments toward the amount of FMC's Allowed Secured Claim, plus all Post-Petition Date interest and Post-Effective Date interest, if any, still due and outstanding under the terms outlined above, from surplus funds if they are available, and if the Reorganized Debtor, in the exercise of his business judgment, believes such a payment will not jeopardize the Reorganized Debtor's ability to make other required Plan payments.

Except as provided in this paragraph, FMC's loan documentation supporting its Allowed Claim, and any lien it possesses regarding the 2015 Ford F350, VIN. 1FT8W3DTXFEB35540, is preserved and shall not be novated by this Plan and said documents shall remain in full force and effect to the extent not modified by this Plan. Such documents and liens shall be unaffected by the Plan, Confirmation, the Confirmation Order and Consummation and shall maintain the same validity, priority, and extent that existed on the Petition Date and shall secure payment of any and all obligations due unto FMC under this Plan until FMC's Allowed Secured Claim is paid and or satisfied.

Section 4.6      **Class 6 – Allowed Secured Claims of Khoury & Vogt Architects, P.A**

**Impairment and Voting**. The Claim in Class 6 is Impaired. Subject to the terms and conditions of the Plan, the Holder of the Allowed Khoury & Vogt Architects, P.A Secured Claim in Class 6 is entitled to vote to accept or reject the Plan. Value of Debtor's assets secured by Khoury & Vogt's alleged security interest per the value shown on Debtor's Fifth Amended Schedules [Doc. No. 152].

| Asset | Value Listed |
|---|---|
| Lot 4 Blk NN Alys Beach 23 La Garza Ct. Panama City Beach, Florida | $2,200,000.00 |

**Treatment**. Subject to the right of the Debtor and/or Reorganized Debtor to dispute any Khoury & Vogt Architects, P.A Secured Claim, including but not limited to filing objections or adversary proceedings thereto per the terms of this Plan and other applicable law, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, on the Effective Date the Reorganized Debtor shall pay such Holder in Cash as follows: the Allowed Amount of the Khoury & Vogt Architects, P.A Secured Claim as of the Effective Date of the Plan. Debtor intends to utilize a portion of the funds from the $4,250,000 exit financing loan from Whale Capital L.P. from the Escrow Account and residual Estimated Effective Date Funds to make this payment on the Effective Date.

Upon receiving the Allowed Amount of said claim, Khoury & Vogt Architects, P.A., shall immediately execute any documents reasonably necessary to remove any lien or liens securing said claim and authorize the filing or personally file the same in the appropriate public

records, including any and all liens upon Lot 4, Blk. NN, Alys Beach, Phase 2B, Panama City Beach, Florida, bearing municipal number 23 La Garza Ct. It will accept such payment in full satisfaction of all Claims, including any and all post-petition claims against the Debtor and/or the Reorganized Debtor. The debt owed to Khoury & Vogt Architects, P.A. will not accrue any interest from the date of the filing of the bankruptcy until the Effective Date, and the debt will not have accrued any late fees, default interest or penalties beyond any such amounts included in the Allowed Secured Claim. Pending receipt of the payment of the Allowed Amount of its Secured Claim, Khoury & Vogt Architects, P.A. will retain any and all liens it may have on property of the Debtor.

Section 4.7 **Class 7 – All Allowed Secured Claims of M & T Bank**

**Impairment and Voting**. The Claim in Class 7 is Impaired. Subject to the terms and conditions of the Plan, the Holder of the Allowed M&T Bank Secured Claim in Class 7 is entitled to vote to accept or reject the Plan. Value of Debtor's assets secured by M & T Bank's security interest per the value shown on Debtor's Fifth Amended Schedules [Doc. No. 152].

| Asset | Value Listed |
|---|---|
| 39 Foot Yellowfin | $420,000.00 |

**Treatment**. Subject to the right of the Debtor and/or Reorganized Debtor to dispute any M&T Bank Secured Claim, including but not limited to filing objections or adversary proceedings filed thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor shall pay such Holder its Allowed Claim plus Post-Petition Date interest from the Petition Date to the Effective Date, at its non-default contract rate of interest, which Debtor asserts is a monthly pro rata portion of 4.99% A.P.R., simple interest[7], either from the sale and/or from any insurance proceeds received as a result of the damage sustained to the 39 foot Yellowfin boat.

While Debtor was transporting the 39 Foot Yellowfin Boat securing the claim of M&T Bank to Delacroix, Louisiana for a sea trial with a prospective buyer, the Debtor was involved in an accident wherein the 39 Foot Yellowfin Boat and trailer was damaged.

Debtor has insurance on the 39 Foot Yellowfin Boat and trailer in the amount of $450,000.00. Debtor has made a claim with his insurance carrier NBOA and or Star Insurance Company for the damages.

Creditor M&T Bank has filed a proof of claim for $254,295.13, and has asserted this full amount is secured by a lien on the 39 Foot Yellowfin Boat.

---

[7] Upon confirmation, it will be presumed that 4.99% A.P.R. is the correct rate of interest for purposes of interest payments in this Class.

Any proceeds received from insurance should be sufficient to pay the aforementioned claim of M&T Bank, in full, and the Debtor would utilize any surplus insurance proceeds to fund other payment obligations under the terms of the Plan.

In the event that the insurance proceeds are not sufficient to pay the claim of the Holder of the Allowed M & T Secured Claims, said Holder will be paid in Cash as follows: a monthly payment of Post-Effective Date interest equal to the monthly pro rata portion of its non-default contract rate of interest, which Debtor asserts is a monthly pro rata portion of 4.99% A.P.R., simple interest, on the Allowed amount of the M&T Secured Claim. M&T Bank shall receive this payment every month following the Effective Date in which it is not paid the full amount of its Allowed Secured Claim and the amount due for Post-Petition Date interest. Should the insurance carrier fail to declare the 39 Foot Yellowfin boat a total loss, Debtor intends to sell the collateral, once it is repaired, for the highest reasonable market value available in order to use the surplus to pay the Allowed Secured Claim of M&T Bank. Should M&T Bank receive the full amount of its Allowed Secured Claim under this Plan and the Post-Petition and Post-Effective Date interest as outlined herein, it will accept this in full satisfaction of all Claims, including any and all post-petition claims against the Debtor and/or Reorganized Debtor; once M&T receives its full Allowed Secured Claim it will release any liens on the 39 Foot Yellowfin boat. The debt owed to M&T Bank will not accrue any interest, late fees, default interest or penalties beyond any such amounts provided for in this paragraph – the Allowed secured claim, Post-Petition interest and Post-Effective Date interest.  Except as otherwise provided in this paragraph, M&T Bank's loan documentation supporting its Allowed Claim, and any lien it possesses regarding the 39 foot, 2016 Model, Yellowfin, is preserved and shall not be novated by this Plan and said documents shall remain in full force and effect to the extent not modified by this Plan.  Such documents and liens shall be unaffected by the Plan, Confirmation, the Confirmation Order and Consummation and shall maintain the same validity, priority, and extent that existed on the Petition Date and shall secure payment of any and all obligations due unto M&T Bank under this Plan until M&T Bank's Allowed Secured Claim is paid and or satisfied.  M&T Bank shall forebear from foreclosing on its collateral for at least twelve months beyond the Effective Date, but shall thereafter reserve the right to exercise any and all rights it may have towards its collateral, or, at its option, renegotiate a revised, renewed payment agreement with the Reorganized Debtor.  Any excess insurance proceeds after payment of the Allowed Secured Claim of M & T Bank and any Post-Petition interest and Post-Effective Date interest thereon shall be deposited in the Escrow Account to pay Allowed Claims pursuant to the terms and provisions of the Plan and/or returned to Whale Capital, L.P. toward payment of the Exit Financing as the circumstances direct.

Debtor and/or Reorganized Debtor reserves the right to make full or partial payments toward the amount of M&T's Allowed Secured Claim, plus all Post-Petition Date interest and Post-Effective Date interest still due and outstanding under the terms outlined above, from surplus funds if they are available, and if the Reorganized Debtor, in the exercise of his business judgment, believes such a payment will not jeopardize the Reorganized Debtor's ability to make other required Plan payments.

Section 4.8    **Class 8 – All Allowed Secured Claims of U.S. Bank National Association**

**Impairment and Voting**.  The Claim in Class 8 is Impaired.  Subject to the terms and conditions of the Plan, the Holder of the Allowed U.S. Bank Secured Claim in Class 8 is entitled to vote to accept or reject the Plan.  Value of Debtor's assets secured by U.S. Bank National Association's security interest per the value shown on Debtor's Fifth Amended Schedules [Doc. No. 152].

| Asset | Value Listed |
|-------|--------------|
| 24 Foot Yellowfin | $ 85,000.00 |

**Treatment**.  Subject to the right of the Debtor and/or Reorganized Debtor to dispute any U.S. Bank Secured Claim, including but not limited to filing objections or adversary proceedings thereto, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, on the Effective Date, the Reorganized Debtor will set aside funds from the 24 Foot Yellowfin Boat Sale ($87,500) (defined further below) sufficient to satisfy the $68,557.26 asserted secured Claim of U.S. Bank, to the extent it is Allowed.  On the Effective Date, the Reorganized Debtor will also set aside funds from this same source to pay U.S. Bank Post-Petition Date interest from the Petition Date to the Effective Date, at either its non-default contract rate of interest, which Debtor asserts is a monthly pro rata portion of 4.870% A.P.R., simple interest, or the monthly pro rata portion of 5.5% A.P.R. simple interest, representing the Prime Rate, plus two percent, interest, whichever is less[8].  In the event that the referenced funds are not available on the Effective Date, the Reorganized Debtor shall pay such Holder in Cash as follows: a monthly payment equal to either its non-default contract rate of interest, which Debtor asserts is a monthly pro rata portion of 4.870% A.P.R., simple interest, or the monthly pro rata portion of 5.5% A.P.R. simple interest, representing the Prime Rate, plus two percent, interest, whichever is less, this Post-Effective Date interest shall be paid, on the value of U.S. Bank's Allowed Secured Claim. U.S. Bank shall receive these payments of Post-Effective Date Interest every month following the Effective Date in which it is not paid the full amount of its Allowed Secured Claim and the Post-Petition Date interest provided for herein. Should U.S. Bank received the full amount of its Allowed Secured Claim under this Plan and the Post-Petition Date Interest and Post-Effective Date interest provided for in the Plan, it will accept this in full satisfaction of all Claims, including any and all post-petition claims against the Debtor and/or Reorganized Debtor. The debt owed to U.S. Bank will not accrue any interest or late fees, default interest or penalties beyond any such amounts included in the Allowed Secured Claim or as provided in this paragraph.  Except as otherwise provided in this paragraph, U.S. Bank's loan documentation supporting its Allowed Claim, and any lien it possesses regarding the 24 foot, 2016, Model Yellowfin, is preserved and shall not be novated by this Plan and said documents

---

[8] Upon Confirmation, it will presumed that 4.870% is the correct rate of interest for purposes of interest payments for this Class.

shall remain in full force and effect to the extent not modified by this Plan. Such documents and liens shall be unaffected by the Plan, Confirmation, the Confirmation Order and Consummation and shall maintain the same validity, priority, and extent that existed on the Petition Date and shall secure payment of any and all obligations due unto U.S. Bank under this Plan until U.S. Bank's Allowed Secured Claim is paid and or satisfied. U.S. Bank shall forebear from foreclosing on its collateral for at least twelve months beyond the Effective Date, but shall thereafter reserve the right to exercise any and all rights it may have towards its collateral, or, at its option, renegotiate a revised, renewed payment agreement with the Reorganized Debtor.

Debtor and/or Reorganized Debtor reserves the right to make full or partial payments toward the amount of U.S. Bank National Association's Allowed Secured Claim, plus all Post-Petition Date interest and Post-Effective Date interest, if any, still due and outstanding under the terms outlined above, from surplus funds if they are available, and if the Reorganized Debtor, in the exercise of his business judgment, believes such a payment will not jeopardize the Reorganized Debtor's ability to make other required Plan payments.

Section 4.9    **Class 9 – Stryker Corporation and Howmedica Osteonics, Corp.**

**Impairment and Voting**. The Claim in Class 9 is Impaired. This class is comprised of the Holder of the Allowed Unsecured Claims of Stryker Corporation ("Stryker") and Howmedica Osteonics, Corp. ("Howmedica"). Both Stryker and Howmedica have filed proofs of claim (Claim Nos. 14 and 15) in the amount of $3,432,147.71. Each of these two claims is based on the single, alleged, unsecured claim amount which these entities assert is due to them jointly and severally pursuant to the March 9, 2016, Judgment in the Michigan Consolidated Matters, and unliquidated amounts for attorneys' fees, costs, and claims for interest in the Michigan Consolidated Matters. Subject to the Debtor's and/or Reorganized Debtor's rights under Title 11 of the United States Code, and as provided for in the Plan, to object or otherwise dispute these claims or request estimation of the same, each of these two entities may vote as a member of this class, but in the tabulation of votes, the amount of the allowed interests considered as voting between Stryker and Howmedica shall not exceed the amount of $3,432,147.71 shared between the two entities.

**Additional Defined Terms Pertaining to Treatment of Class 9 Claims**.

The "Michigan Action" is defined as the lawsuit initiated on or about September 30, 2013, by Howmedica along with its parent company Stryker with the filing of a Complaint against the Debtor, Mr. Ridgeway, and Richard Steitzer, and Biomet, Inc. in the United States District Court for the Western District of Michigan Southern Division[9], which action is captioned *Stryker Corporation; Howmedica Osteonics Corp. v. Christopher Ridgeway; Richard Steitzer;*

---

[9] Citations to the docket of the Michigan Action will be noted herein as [Mich. Dkt. No. __ ].

*and Biomet, Inc.*[10]; Case Number 1:13-cv-01066 c/w *Stone Surgical, LLC v. Stryker Corporation, et al.* Case Number 1:14-cv-00889 (the "Michigan Action"). [Mich. Dkt. No. 1], including all claims, defenses, counterclaims, amended pleadings and claims, and other components and docket entries therein.

The "W.D. Mich. District Court" is defined as the United States District Court for the Western District of Michigan Southern Division, where the Michigan Action was filed and which issued the March 9, 2016, Judgment defined herein below.

The "Stone Surgical Action" is defined as the action originally filed on November 1, 2013, by Stone Surgical, LLC, against Stryker and Howmedica in the United States District Court for the Eastern District of Louisiana, seeking damages against Stryker and Howmedica for, *inter alia*, violations of the Louisiana Unfair Trade Practices Act, fraud, unjust enrichment, and tortious interference with a business relationship and a contract, which was subsequently transferred to the W.D. Mich. District Court under the "first filed" rule and thereafter assigned case number 1:14-cv-00889, was consolidated with the Michigan Action, and which proceeded to trial; this term refers to all claims, defenses, counterclaims, amended pleadings and claims, and other components and docket entries in that action.

The "Michigan Consolidated Matters" is defined as follows. The Michigan Action and the Stone Surgical Action were consolidated, and the Michigan Action was designated the lead case, by order of the W.D. Mich. District Court entered on October 3, 2014, collectively, these consolidated cases are referred to herein as the "Michigan Consolidated Matters". *See* Mich. Dkt. No. 94].

The "Judgment" or "March 9, 2016, Judgment" is defined to refer to the judgment entered on March 9, 2016, by the W.D. Mich. District Court [Mich. Dkt. No. 688], signed by the Honorable Robert Holmes Bell, United States District Judge, which was entered in favor of Stryker and Howmedica against the Debtor Christopher Ridgeway in the amount of $745,195.00, and which entered a judgment of no-cause as to both the Debtor's counterclaims against Stryker and Howmedica, and against Stone Surgical, LLC's claims against Stryker and Howmedica. *Id.*

The "Sixth Circuit" is defined as the United States Court of Appeals for the Sixth Circuit.

The "Sixth Circuit Appeal" is defined to refer to the consolidated appeals of the March 9, 2016 Judgment in the Michigan Consolidated Matters now pending before the Sixth Circuit initiated by Stone Surgical, LLC and the Debtor Christopher Ridgeway, which are presently assigned case numbers 16-1654 and 16-1434. The Debtor's appeal to the Sixth Circuit seeks to, *inter alia*, have the Sixth Circuit determine that the W.D. Mich. District Court lacked personal

---

[10] Pursuant to a joint motion of Stryker, Howmedica and Biomet, Inc., Biomet Microfixation, LLC was substituted for Biomet, Inc. as a defendant in the Michigan Action, by order of the court entered on September 21, 2015. [Mich. Dkt. No. 292].

jurisdiction over the Debtor Christopher Martin Ridgeway, and that the March 9, 2016 Judgment must be nullified.

**Treatment.** Unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and Stryker and Howmedica in writing, the Reorganized Debtor shall treat the Claims in this class as follows:

The Debtor and/or Reorganized Debtor reserve all rights under Title 11 of the United States Code, and as provided for in the Plan, to initiate any dispute resolution mechanism regarding the Unsecured Claims of Stryker and Howmedica, including the filing of an objection thereto, and initiating any other contested matter, adversary proceedings, and or proceeding to estimate claims.

TheClaims of Stryker and Howmedica, presently set forth in Proofs of Claim Nos. 14 and 15, are based on the same single, alleged, unsecured claim amount which these entities assert is due to them jointly and severally pursuant to the March 9, 2016, Judgment including unliquidated awards for attorneys' fees, costs, and claims for interest in the Michigan Consolidated Matters. Specifically, in Proofs of Claim Nos. 14 and 15, Stryker and Howmedica set forth their undivided, shared interest in the $3,432,147.71 in Claims into seven sub-parts, as follows:

1. $223,351.16 in unliquidated attorneys' fees and costs based on the Second Sanctions Fee Petition, the latter being a term defined in Stryker and Howmedica's Proofs of Claim, (the "$223k Second Sanction Fees and Costs");
2. $745,195.00 for liquidated actual damages set forth in the March 9, 2016, Judgment in the Michigan Consolidated Matters (the "745k Judgment");

Stryker and Howmedica requested that they be allowed to include following additional information in the Disclosure Statement and Plan. That additional information requested by Stryker and Howmedica is marked with the "#" sign. Debtor disagrees with the following additional information supplied by Stryker and Howmedica.

#2a. Stryker and Howmedica asserts that they are entitled to post-judgment interest including post-Petition interest, on the jury award of $745,195.00 pursuant to 28 U.S.C. § 1961. Stryker and Homedica assert that based on 28 U.S.C. § 1961(a), the applicable rate is 0.66%. Interest is computed daily and shall be compounded annually. 28 U.S.C. § 1961(b). As of the Petition Date, Stryker and Howmedica assert the daily post-judgment interest on the Judgment was $13.47. ("Post Judgment Interest").

3. $2,272,369.54 for unliquidated attorneys' fees - excluding the amount requested in the Second Sanctions Fee Petition (the "$2.2M Additional Attorneys' Fees");

4.      $143,535.29 in unliquidated costs - excluding the amount requested in the Second Sanctions Fee Petition (the "$143k Costs");

5.      $47,508.14 for unliquidated pre-judgment interest (the "$47k Pre-Judgment Interest");

6.      $188.58 for unliquidated post-judgment interest accrued prior to the Petition Date (the "$188 Post-Judgment Interest");

7.      An unknown amount of post-judgment interest accruing after the Petition Date (the "Unknown Post-Judgment Interest").

Stryker and Howmedica  requested that they be allowed to include the following additional information in the Disclosure Statement and Plan.  That  additional information requested by Stryker and Howmedica are marked with the "#" sign.  Debtor disagrees with the following additional information supplied by Stryker and Howmedica.

#8      Stryker and Howmedica further asserts that they are entitled to post-judgment interest including post-Petition interest on the remainder of their unliquidated claims for attorneys' fees and costs in the amount of $2,639,255.99 from the date of entry of a judgment liquidating same until the date of payment.  28 U.S.C. § 1961(a).  ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").  Stryker and Howmedica assert the  rate of interest "shall be calculated form the date of the entry of the judgment, at a rate equal to the weekly 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  *Id*.  Stryker and Howmedica assert this rate  is currently 0.61% equaling daily post-judgment interest of $44.11 ("Unliquidated Attorneys Fees and Costs Claim Post Petition Interest").

#9.     Finally, Stryker and Howmedica assert that they are entitled to pre-judgment interest, including post-Petition interest on its unliquidated claims for attorneys' fee and costs in the amount of $2,639,255.99 pursuant to Michigan state law. M.C.L. § 600.6013(8).  ("Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs.").  Stryker and Howmedica assert they are entitled to post-Petition interest on these unliquidated claims pursuant to M.C.L. § 600.6013 through the date of entry of a judgment liquidating same.  Stryker and Howmedica assert the rate of interest is "equal to 1% plus the average interest paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section."  *Id*.  As of the Petition Date, Stryker and Howmedica assert this rate was

1.14% equaling daily post-judgment interest of $82.43 ("Michigan Law Pre-Judgment Interest").

(all components of Stryker's and Howmedica's Proofs of Claim 14 and 15, will herein be referred to as the "Stryker Howmedica Collective Unsecured Claim"; this defined term shall not include Stryker's and Howmedica's asserted right to post-Petition interest.)

Subject to the terms below, as of the Effective Date, $3,432,147.71, representing the amount enumerated as of September 27, 2016, in the Proofs of Claim Nos. 14 and 15 filed by Stryker and Howmedica will be deposited in a dedicated interest bearing bank escrow account ("Escrow Account") with Regions Bank ("Escrow Agent"), subject to execution of appropriate documentation establishing the Escrow Account and Escrow Agent upon such usual and customary terms and conditions. Any payment to Stryker and Howmedica under the Plan on their Allowed Unsecured Claims will be provided from the amounts deposited into the Escrow Account as further described below.

No later than thirty (30) days from the Effective Date of the Plan, The Debtor or Reorganized Debtor will in the Bankruptcy Court initiate any dispute resolution mechanism permitted under the Plan or Title 11 of the United States Code, including but not limited to contested matters, objections, adversary proceedings, and or a proceedings to estimate claims regarding any and all components of what Stryker and/or Howmedica assert should form part of their Allowed Unsecured Claims, including the Stryker Howmedica Collective Unsecured Claim, and any and all asserted rights to post-Petition interest on Stryker's and Howmedica's Claims including Post-Judgment Interest, Unliquidated Attorney Fees and Costs Claim, Post Petition Interest, and Michigan Law Pre-Judgment Interest, and any other claims to interest, fees, attorney fees or costs ("Debtor's Stryker Howmedica Objections").

Through Debtor's Stryker Howmedica Objections, Debtor or Reorganized Debtor will request that the Bankruptcy Court determine the Allowed amount of Stryker's and Howmedica's Unsecured Claims, subject to the Sixth Circuit Final Judgment (defined below), and any amounts of post-Petition interest, any other claimed amount of interest and/or attorney fees included and or associated therewith that the Bankruptcy Court determines must be paid for this Plan to comply with the Bankruptcy Code. Following the entry of final non-appealable orders or judgments on Debtor's Stryker Howmedica Objections Debtor or Reorganized Debtor will retain funds in the Escrow Account sufficient to satisfy the Allowed amount of Stryker's and Howmedica's Unsecured Claims, including any post-Petition interest, Post-Judgment Interest, Unliquidated Attorney Fees and Costs Claim, Post Petition Interest, and Michigan Law Pre-Judgment Interest, and any other claimed amount of interest, fees, costs and/or attorney fees that

the Bankruptcy Court determines must be paid,  if any, subject to the Sixth Circuit Final Judgment (The "Provisional Stryker Escrow Amount").

Debtor maintains that post-Petition interest payments are not components  of Stryker's or Howmedica's Allowed Unsecured Claims and are not required to confirm the Plan.  However, as part of the Provisional Stryker Escrow Amount, Debtor and or Reorganized Debtor will maintain funds in the Escrow Account sufficient to pay post-judgment interest , including post-Petition interest specifically on the $745,195.00 awarded under the March 9, 2016, Judgment in the Michigan Consolidated Matters, utilizing the interest rate detailed in 28 U.S.C. § 1961(a), that is interest calculated from the date of the entry of the Judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the Judgment, which was .66%; in keeping with the terms of 28 U.S.C. § 1961(a), interest shall be computed daily to the date of payment, and shall be compounded annually.

The Provisional Stryker Escrow Amount will be disbursed from the Escrow Account subject to and in accordance with the following procedures after the entry of a final nonappealable order or judgment entered in the Sixth Circuit Appeal, or such other final nonappealable judgment or order subsequent and related thereto concerning the Michigan Consolidated Matters, including a decision on rehearing of the Sixth Circuit Appeal, a hearing en banc, writ to the United States Supreme Court, and or a final non-appealable order entered on remand or further appeal following remand ("Sixth Circuit Final Judgment").

If the Sixth Circuit Final Judgment affirms the initial March 9, 2016, Judgment in the Michigan Consolidated Matters in the amount of $745,195.00, without any modification, including the amount awarded in the Judgment, the terms therein or basis therefor, the Provisional Stryker Escrow Amount  will be dispersed pro rata between Stryker and Howmedica on or before sixty (60) days following the Sixth Circuit Final Judgment[11].

If the Sixth Circuit Final Judgment modifies the March 9, 2016, Judgment in the Michigan Consolidated Matters in any manner, including the amount awarded in the Judgment, the terms therein or basis therefor, unless otherwise agreed between the Debtor or Reorganized Debtor and Stryker and Howmedica, Debtor or Reorganized Debtor or Stryker or Howmedica shall file a motion with the Bankruptcy Court on or before sixty (60) days following the Sixth Circuit Final Judgment to request that the Bankruptcy Court determine how the Provisional

---

[11] For purposes of this Class, Class 9, statements regarding sixty (60) days from or following or after the Sixth Circuit Final Judgment should be understood to mean sixty (60) days following the date the said judgment or order becomes, as a matter of law, final and non-appealable.

Stryker Escrow Amount  should be disbursed.  The Bankruptcy Court shall retain jurisdiction to review and adjudicate such a motion. Regarding such motion, to the extent the modification affirms the amount awarded in, the terms in or the basis for, the March 9, 2016, Judgment, the Provisional Stryker Escrow Amount , to the extent of the modification, shall be disbursed pro rata to Stryker and Howmedica; to the extent the modification is favorable to the Debtor and/or Reorganized Debtor, the Provisional Stryker Escrow Amount, to the extent of the modification, shall be released to the Debtor and/or Reorganized Debtor to pay Allowed Claims and/or return to Whale Capital, L.P. toward payment of the Exit Financing as the circumstances direct.  And to the extent the Sixth Circuit Final Judgment results in a finding that the W.D. Mich. District Court lacked personal jurisdiction over the Debtor Christopher Ridgeway, the amount in the Escrow Account for the Provisional Stryker Escrow Amount, to the extent of the modification, shall be released to the Debtor and/or Reorganized Debtor to pay Allowed Claims pursuant to the terms and provisions of the Plan and/or return to Whale Capital, L.P. toward payment of the Exit Financing as the circumstances direct.

To the extent that the Sixth Circuit Final Judgment includes a finding that  the W.D. Mich. District Court lacked personal jurisdiction over the Debtor Christopher Ridgeway or includes any other holding or finding that Debtor or Reorganized Debtor or Stryker or Howmedica allege leaves certain Claims unadjudicated and/or undetermined Debtor or Reorganized Debtor or Stryker or Howmedica shall file a motion with the Bankruptcy Court on or before sixty (60) days following the Sixth Circuit Final Judgment and ask the Bankruptcy Court to estimate the value of such Claims for all purposes under the Bankruptcy Code, including distribution under this Plan, determine the Allowed amount of said Claim, and/or distribute the Provisional Stryker Escrow Amount accordingly.Following the entry of the Sixth Circuit Final Judgment, and the procedures outlined above, and compliance with the final orders and or judgments issued pursuant thereto, the amount remaining in the Escrow Account shall be released from the Escrow Account to the Debtor or Reorganized Debtor to pay Allowed Claims pursuant to the terms and provisions of the Plan and/or return to Whale Capital, L.P. toward payment of the Exit Financing as the circumstances direct.

Upon entry of a final non-appealable order or judgment that addresses any and all claims and disputes arising in, related to or in any way pertaining to the Michigan Consolidated Matters, which includes but is not limited to a final non-appealable order or judgment resolving any and all claims and disputes in any appeal of the March 9, 2016,  Judgment entered in the Michigan Consolidated Matters, including but not limited to the Sixth Circuit Appeal defined above, and payment of any amounts, if any, in accord with the terms of such orders or judgments, per the terms herein, and upon entry of a final non-appealable order or judgment resolving any and all disputes and or objections regarding the Allowed amount of the Claims of Stryker and

36

Howmedica in the Bankruptcy Case, and payment of any amounts, if any, set forth in those orders or judgments, Stryker and Howmedica and Debtor\Reorganized Debtor will execute any and all documents necessary to terminate and dismiss any and all litigation between themselves regarding Pre-Petition Claims, and any or all other causes of action.

Should Stryker and/or Howmedica receive any sums determined upon entry of a final nonappealable order, or judgment and the Sixth Circuit Final Judgment, to be the Allowed Claims of Stryker and Howmedica, Stryker and Howmedica shall accept such payment of said sums, if any, in full satisfaction of all Claims, including any and all post-petition claims against the Debtor and/or Reorganized Debtor.

The Reorganized Debtor as of the Effective Date reserves the right to seek authority from any Court with appropriate jurisdiction, should same be deemed requisite, to declare that the funds in the Escrow Account shall be sufficient as a supersedes bond regarding the Sixth Circuit Appeal or any appeal, review or writ thereafter.

The Bankruptcy Court shall retain jurisdiction to resolve any and all disputes regarding the interpretation of this section.

## Section 4.10    **Class 10 – July 29, 2016 Unsecured Claims**

**Impairment and Voting**.  The Claim in Class 10 are Impaired.  Subject to the terms and conditions of the Plan, the Holder of the July 29, 2016 Unsecured Claims in Class 10 are entitled to vote to accept or reject the Plan.  These claims consists of the claims filed as Unsecured Claims by the July 29, 2016, bar date established by the Bankruptcy Court for non-governmental proofs of claim, excluding the claims of Stryker and Howmedica, and/or claims filed by governmental units received by August 31, 2016, prior to the bar date established for such units – September 19, 2016.

Amount of Claims: The amount of claims in Class 10 total $320,774.61.

**Treatment**.  Subject to the right of the Debtor and/or Reorganized Debtor to dispute any July 29, 2016 Unsecured Claims, including but not limited to filing objections or adversary proceedings related thereto per the terms of this Plan or relevant law, and unless otherwise agreed to by the Debtor, or after the Effective Date, the Reorganized Debtor and such Holder, the Reorganized Debtor shall pay such Holder in Cash as follows:  On the Effective Date of the Plan, the Reorganized Debtor shall pay the Holders of such Claims the Allowed Amount of said claims without interest. Debtor intends to utilize a portion of the funds from the $4,250,000 exit financing loan from Whale Capital L.P. from the Escrow Account and or residual Estimated Effective Date Funds to make this payment on the Effective Date.

Section 4.11    **Class 11 – General Unsecured Claims**

**Impairment and Voting**.  The Claim in Class 11 are Impaired.  Subject to the terms and conditions of the Plan, the Holders of the General Unsecured Claims in Class 11 are entitled to vote to accept or reject the Plan.  These claims consists of claims not otherwise categorized herein, or Claims of Secured Creditors to the extent they are not satisfied in full through the sale of their collateral or other sales discussed herein.  The only claim which Debtor estimates may potentially be included in Class 11 would be the deficiency balance, if any, of the Allowed Secured Claim of J.P. Morgan Chase Bank.

**Treatment.**  Once claims in this Class 11 are determined, the Reorganized Debtor will pay said debts in a period of time of a maximum of one year, on a pro rata basis, dedicating between $2,000 - $4,000 a month to said purpose.  Nothing herein shall prevent the Reorganized Debtor from paying such claims all at once or paying such Claims in a greater sum per month than as provided herein.  Any amount outstanding due and owing shall be paid by Debtor on or before twelve months from the Effective Date.

## ARTICLE V
## DISPUTED CLAIMS

Section 5.1    **Right to Object to Claims**.  Except to the extent a Claim is Allowed hereunder, the Debtor and, after the Effective Date, the Reorganized Debtor shall have the exclusive right to object to the allowance, amount, or classification of Claims and such objections may be litigated (including to Final Order) by the Debtor or Reorganized Debtor, as the case may be, or compromised and settled in accordance with its business judgment without further order of the Bankruptcy Court.

Section 5.2    **Deadline for Objecting to Claims**.  As soon as reasonably practicable, but in no event later than ninety (90) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court (which may be ordered upon *ex parte* motion of the Reorganized Debtor), all objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims.  An objection shall notify the Holder of the Claim of the deadline for responding to such objection. However, notwithstanding the foregoing, the Debtor will also have the right to file objections to Claims of governmental units for (90) days after the September 19, 2016, bar date set for Claims of governmental units in this Court's order of July 20, 2016. *See* Docket No. 82.

Section 5.3    **Deadline for Responding to Objections**.  Except as otherwise agreed by the Debtor or after the Effective Date, the Reorganized Debtor and the Holder of the objected-to Claim or unless an order enlarging the time period for same is requested by the responding creditor within thirty (30) days after service of an objection, and such request is granted by the Court, any written response to the objection must be filed with the Bankruptcy Court by the Holder of the objected-to Claim and must be served upon the Debtor or, after the Effective Date, the Reorganized Debtor and upon counsel to the Debtor or Reorganized Debtor, as the case may

be within thirty (30) days after service of the objection. Failure to file a written response in accordance with this provision shall constitute a waiver and release of the subject Claim, and shall cause the Bankruptcy Court to enter a default judgment against the non-responding Holder of the Claim granting the relief requested in the objection.

Section 5.4 **Estimation of Claims**. The Debtor may request the Bankruptcy Court to estimate any contingent or Disputed Claim for purposes of allowance under Section 502(c) of the Bankruptcy Code.

Section 5.5 **Payment of Disputed Claims**. A chart showing all Claims identified either in the Schedules filed by the Debtor or the Claims Registry of the Bankruptcy Case immediately following the July 29, 2016, bar date for Claims for non-governmental entities set by the Bankruptcy Court's order of June 20, 2016, plus the claim filed by LDR prior to the September 19, 2016, bar date for governmental units is attached hereto as Exhibit D. As further detailed elsewhere in this Plan, it is anticipated funds from several sources will be available as of the Effective Date to pay Claims in this case.

However, though the those funds will be available for potential distribution on the Effective Date to potentially pay certain Claims on that date, any such payment will be made subject to and pursuant to the terms of this Plan, and the Escrow Account and the Reorganized Debtor will only pay Allowed Claims from the Escrow Account. Furthermore, the Reorganized Debtor specifically reserves all its rights to object to any Claim in the time frame outlined in Article V of this Plan.

Subject to specific terms regarding objections or disputes or other treatment regarding specific Claims or Classes of Claims detailed elsewhere in this Plan, if Reorganized Debtor's funds are paid to satisfy a Claim, but a timely objection under Article V of this Plan is later filed, to the extent the objection is sustained, the relevant funds shall be returned within 30 days of the Final Order on the objection to the Reorganized Debtor, except for a Final Order sustaining any objection to the Claim of a Creditor included in Class 1 of the Plan, in which case the relevant funds shall be returned and/or disgorged to the Reorganized Debtor within 90 days of said Final Order; such returned and/or disgorged relevant funds will be held in the Escrow Account and used in his business judgment to ensure the completion of all payments contemplated by the Plan. If an objection to a Claim is pending as of the Effective Date, then the Reorganized Debtor, in his discretion, may pay any amount of the funds not in dispute to the Holder of said Claim, or may hold all or the disputed portion of the entire amount reserved for said Claim in the Escrow Account described in Class 9 above pending resolution of the objection; to the extent such objection is later resolved in favor of the creditor, affected funds will be distributed to the Holder of the Claim. To the extent such objection is resolved in favor of the Reorganized Debtor, the funds and the interest attributable thereto shall be held in the Escrow Account by the Reorganized Debtor and used in the business judgment of the Reorganized Debtor to ensure the completion of all payments contemplated by the Plan. The Reorganized Debtor may, but shall not be required to, make a Distribution with respect to the portion of a Disputed Claim that is not in dispute (if any) pending the resolution of the entire Claim.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 6.1   **Assumption and Rejection**.   On the Effective Date, all executory contracts and unexpired leases that exist between the Debtor and any Entity not specifically assumed herein are rejected.  Prior to the filing of this Amended Plan, Debtor had rejected the Executory Contract of Ebsco Development.  Notwithstanding the foregoing, this provision shall not apply to nullify contracts executed to secure services included in the Debtor's post-petition Monthly Budget as Approved by the Bankruptcy Court, such contracts are assumed even if not specifically listed below.

Section 6.2   **Approval of Assumption and Rejection**.  Except as otherwise provided in the Disclosure Statement or in the Plan, entry of the Confirmation Order shall constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption, assumption and assignment, or rejection of the executory contracts and unexpired leases, as the case may be, pursuant to this Article VI, and (ii) the extension of time pursuant to section 365(d)(4) of the Bankruptcy Code within which the Debtor may assume or reject the unexpired leases specified in this Article VI through the Confirmation Date.

Section 6.3   **Rejection Damage Claims**.  Claims arising out of the rejection of an executory contact or unexpired lease pursuant to this Article VI must be filed with the Bankruptcy Court no later than thirty (30) days after entry of the Confirmation Order.  Any such Claims not filed within such time will be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or any of his agents, successors, or assigns.  Unless otherwise order by the Bankruptcy Court, all Claims arising from the rejection of an executory contact or unexpired lease shall be treated as a Class 11 General Unsecured Claim

Section 6.4   **Contracts Specifically Assumed**   The following contracts are to be specifically assumed, assuming they have not expired by their own terms as of the Effective Date of this Plan:

(a)   The Central Listing Agreement with Travis Royall of Legendary Marine to list the 39ft, 39 CC Yellowfin, 2016, named Reel Flight, Hull No. YFY39083I516, for sale on behalf of the Debtor, dated June 24, 2016. *See* Docket No. 99, Exhibit A thereto.  The assumption of this contract will be predicated upon the court's approval of this listing agreement, which is set for the court's consideration on August 16, 2016.

(b)   The storage agreement between Legendary Marina and the Debtor.

(c)   The Listing Agreement with Shawn McCarthy of McCarthy Group Realtors, dated June 30, 2016, regarding Lot 31, Block B, Fort Beauregard Marina Estates, in St. Bernard Parish, Louisiana. See Docket No. 107-1.  This is a contract employing a sales agent to sell certain immovable property on behalf of the estate and the Debtor-In-Possession.  The

40

assumption of this contract will be predicated upon the court's approval of this listing agreement, which is set for the court's consideration on August 16, 2016.

(d) The Listing Agreement between Christopher Ridgeway and Premier Property Group, beginning June 10, 2016, and terminating on December 10, 2016, for the facilitation of the sale of property at 23 La Garza Ct., Alys Beach, FL 32413, Lot 4, BLK NN Alys Beach PH 2B PB 16-81 or 2943-287. This listing agreement was approved the court on July 21, 2016. *See* Docket No. 126.

(e) To the extent they are considered executory contracts, any operating agreements, employment agreement, bylaws and/or articles of organization of Stone Clinical Laboratories LLC, Stone Surgical, LLC, Stone Biotechnologies, LLC, Stone Diagnostic Laboratories, LLC and Ridgeway Development Company LLC.

## ARTICLE VII
## MEANS OF IMPLEMENTATION AND EXECUTION OF PLAN

Section 7.1 **Generally**. Upon Confirmation, the Debtor shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan including the execution and filing of all documents required or contemplated by the Plan. In connection with the occurrence of the Effective Date, the Reorganized Debtor is authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Section 7.2 **Exit Financing From Whale Capital, L.P. - $4.25 Million Dollars ("Whale Loan")** Prior to or on the Effective Date, the Debtor and/or Reorganized Debtor shall receive exit financing in the amount of $4,250,000 from Whale Capital L.P. ("Whale"). Pursuant to the terms of the exit financing, the Reorganized Debtor shall receive funds totaling $4,250,000.00 ("Exit Financing Proceeds") to be distributed in accordance with the term of the Escrow Agreement, attached hereto as Exhibit "F". Upon receipt of the Exit Financing Proceeds, the Reorganized Debtor shall make payments to the Allowed Claims in accordance with the terms and provisions of the Plan. In exchange for the Exit Financing Proceeds, the Debtor and/or Reorganized Debtor shall grant Whale a security interest in seventy-five percent (75%) of the Debtor and/or Reorganized Debtor's right to receive proceeds from the operation of Stone Clinical Laboratories L.L.C. ("Stone Clinical") and such other personal property described on Exhibit "G", and shall pay Whale in accordance with the terms of the Promissory Note. The funds used to pay Whale pursuant to the terms of the Promissory Note will come from the Reorganized Debtor's post-confirmation operation of Stone Clinical and will not have a negative effect on the plan payments set forth herein. Drafts of the Assignment, Pledge and Security Agreement and Promissory Note, constructed pursuant to this agreement, are attached hereto as Exhibits "G" and "H".

41

The Exit Financing Proceeds shall be deposited into an Escrow Account with Regions Bank as Escrow Agent upon such terms and conditions as set forth in the Escrow Agreement which is attached as Exhibit "F" and incorporated herein as if set forth in extenso.

The Debtor and/or Reorganized Debtor and Whale shall be bound by the terms of the Escrow Agreement, Assignment, Pledge and Security Agreement and Promissory Note ("Exit Financing Documents"), drafts of which are attached hereto as Exhibit "F, G and H" respectively and incorporated herein as if set forth in extenso. Debtor and Whale will also agree to a UCC-1 Form to accompany these documents, on such terms as are agreed between them.

The Exit Financing Documents and the Escrow Agreement shall be approved and shall become effective upon Confirmation of the Plan and recordation of the Confirmation Order and UCC-1 in the applicable mortgage records. No other documents need to be recorded in order for the exit financing to become effective.

Section 7.3 **One Time Cash Infusion From Stone Clinical Laboratories, LLC, Based on Non-Disbursed Salary Earned by Debtor ("Stone Clinical Earned Salary Distribution")** The Debtor owns sixty-five percent of the membership interests in Stone Clinical Laboratories, LLC, a Louisiana Limited Liability Company, ("Stone Clinical"), that offers a variety of testing and laboratory services, and in addition to Debtor's rights to receive distributions from the net profits of this company, beginning in July of 2016, Debtor is entitled to $50,000 a month in salary from Stone Clinical. To date, Stone Clinical has not disbursed any amounts on account of salary to the Debtor. However, Stone Clinical presently has sufficient funds on hand to pay the Debtor's $50,000 monthly salary for over a year, and furthermore, is projected to generate a profit over the next twelve months following the commencement of operations in September or October of 2016. As of October 2016, Debtor will have accrued the right to receive $150,000 in salary previously earned from Stone Clinical for July-September, in addition to the $50,000 owed for the salary for the month of October of 2016. On or before the Effective Date, estimated to occur no sooner than October of 2016, Debtor intends to draw this $150,000 in accrued salary from Stone Clinical and utilize the same to make payments on the Allowed Claim pursuant to the terms and provisions of the Plan.

*The funds described in Section 7.2 and 7.3 will be deposited in the Escrow Account described above.

Section 7.4 **Refinance of Whitney Bank Claim ("Whitney Refinance")** Treatment of Whitney Bank's claim is detailed and determined by Article IV of this Plan, Section 4.2. The present section is simply a summary and restatement of the provisions in that article and is not intended to modify that prior section. Whitney filed a proof of claim for $2,677,531.22 on July 12, 2016. *See* Claim No. 10. As detailed on the Attachment to Proof of Claim, see Claim No. 10-1 Part 2, the $2,677,531.22 figure consists of amounts attributable to principal and interest on five loans (loan nos. 1432816799, 12009763749, 12009973702, 12009885591, and

66000181529), and Whitney states that interest, fees and costs and other amounts continue to accrue after March 23, 2016. Through the Plan, Debtor proposes to pay all accrued interest, costs and fees and attorneys' fees and costs owed under the aforementioned loans on the Effective Date of the Plan.

With the payment of such fees and costs and interest, the remaining amount of Whitney's claim is the principal amount owed on the five loans, as of August 9, 2016, these amounts were estimated to equal $359,064.66 on Loan no. 1432816799; $820,000 under Loan no.12009763749; $1,100,000 under Loan no. 12009973702; $149,755.38 for Loan no. 12009885591; and $225,862.49 for Loan no. 66000181529.

On the Effective Date, the Debtor will pay Whitney $150,000 and Whitney will use this amount to reduce the principal amount owed under Loan no. 66000181529 (presently estimated to be $225,862.49).

The remaining principal owed under the five loans, estimated to be $2,504,682.53, will be refinanced with Whitney through the execution of two new promissory notes and accompanying loan documentation.

On the Effective Date, Debtor will refinance the principal amount owed on Loan no. 1432816799 (estimated to be $359,064.66) by executing a new promissory note on the same terms as the current promissory note supporting Loan no. 1432816799. This new note will be secured by the mortgage currently recorded in the Parish of Jefferson, State of Louisiana in MOB 4622, Page 792 as number 11431034.

And on the Effective Date, Debtor will refinance the principal amount owed on Loan no.12009763749; Loan no. 12009973702; Loan no. 12009885591; and Loan no. 66000181529, estimated to collectively be $2,145,617.87, by executing a second, new, promissory note for the consolidated amount of principal still owed under these four loans, to replace the four separate notes currently supporting these loans. Debtor, Stephanie Stone Ridgeway, and Stone Surgical, LLC will each be liable *in solido* for all amounts due under this consolidated note. The consolidated note will be payable in monthly installments of principal and interest based upon a 15 year amortization, bear interest at 5.00% per annum, and mature on September 30, 2019. The new consolidated note will be secured by the current the mortgage recorded in the Parish of Jefferson, State of Louisiana in MOB 4622, Page 794 as number 11431037; the mortgage recorded in the official records of the County of Walton, State of Florida in CFN 1270916 or Bk. 2943; and the mortgage recorded in the Parish of St. Bernard at File No. 590691, MOB 1764, Page 334.

Debtor still intends to sell the lot in Ft. Beauregard, Chalmette, Louisiana, and his lot at 23 La Garza Street, Panama City Beach, Florida, and will use the proceeds from the same to reduce his refinanced debt to Whitney Bank. Refinancing the debt to Whitney allows the reorganization of the Debtor to proceed at a more efficient pace.

43

Section 7.5      **Dedication of Monthly Income**   Debtor is the sole owner of Stone Biotechnologies, LLC ("Stone Biotechnologies") and Stone Diagnostic Laboratories, LLC ("Stone Diagnostic"), two Louisiana limited liability companies. Both companies engage in the same type of business, and remain active to this day.   These companies market the test menus offered by client laboratories to a diverse clientele, including hospitals, physician groups, and other laboratories which do not have the capability to conduct certain tests offered by the labs represented by Stone Biotechnologies and Stone Diagnostic. Generally, Stone Biotechnologies and Stone Diagnostic receive payment on the basis of commission, a percentage of billings on a per specimen basis for each specimen referred to the lab by the companies. The companies have been financially successful, generating net profits since they were established. Debtor receives and Reorganized Debtor will continue to draw at least approximately $28,575 in monthly income through Stone Biotechnologies and Stone Diagnostic, the majority of that draw coming from Stone Biotechnologies; Debtor's wife, Stephanie Stone Ridgeway, also draws a $10,000 monthly salary from the same entities. *See* Doc. No. 92 that Amended Schedules, Schedule I.  Stephanie Stone Ridgeway will contribute her $10,000 monthly salary to the Plan (collectively the salary of the Debtor or Reorganized Debtor and Stephanie Ridgeway from Stone Biotechnologies and Stone Diagnostic is hereafter referred to as the "38k Stone Biotechnologies Salary").   The Reorganized Debtor will utilize the 38k Stone Biotechnologies Salary to pay the Allowed Claims pursuant to the terms and provisions of the Plan.

As noted above, Debtor also owns sixty-five percent of the membership interests in Stone Clinical Laboratories, LLC, that, beginning in November of 2016, will offer a diverse menu of tests to clients ranging from hospitals to individual physician offices.  Such tests will include but not be limited to urine drug tests, standard blood tests, cancer panels, and pharmacogenomics testing. Beginning in July of 2016, Debtor is entitled to $50,000 a month in salary from Stone Clinical (the "50k Stone Clinical Salary") and Stone Clinical has an obligation to distribute funds sufficient to pay income taxes owed on salary disbursed to the Debtor. Stone Clinical has secured sufficient initial funds to pay Debtor's $50,000 monthly salary for over a year, and furthermore, Stone Clinical is projected to realize a net profit of approximately $4,544,585 in its first twelve months of operation. The Reorganized Debtor will utilize the 50k Stone Clinical Salary to pay the Allowed Claims pursuant to the terms and provisions the Plan.

Through the 38k Stone Biotechnologies Salary and the 50k Stone Clinical Salary, after deducting costs of living expenses and withholding funds for taxes, it is anticipated that Debtor and/or Reorganized Debtor will be able to contribute approximately $37,000 net of personal expenses, a month to help fund the Plan.

Section 7.6      **Residual Cash From Pre-Effective Date Period ("Residual Pre-Effective Date Cash")**  The certified public accountant employed by the Debtor, Patrick J. Gros, estimates that in addition to other amounts discussed herein, at least $5,000 in surplus cash will be available to the Reorganized Debtor on the Effective Date from pre-Effective Date activities; the Reorganized Debtor will utilize such funds to satisfy obligations under the Plan.

Section 7.7 **Sale of Assets.** Lot in Covey Rise Development, Tangipahoa Parish, Louisiana ("Covey Rise Lot Sale").

On or before the Effective Date, it is presently anticipated that Debtor and/or Reorganized Debtor will receive $101,100, which will be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan, from the sale of certain immovable property located in Section 44, Township 4 South, Range 9 East, Greensburg Land District, Tangipahoa Parish, Louisiana, and an accompanying servitude, all more fully described in a Cash Deed recorded at Book 1345, Page 113, Instrument Number 918649 in Tangipahoa Parish, Louisiana (the "Covey Rise Lot").

This property has been described in Debtor's Schedules as the "Covey Rise Lot." *See* Docket No. 152 at 8.

Debtor's counsel has recently learned that this property was not acquired by the Debtor, but rather by a legal entity separate and apart from the Debtor but wholly owned and managed by the Debtor. The entity that acquired this lot per the Cash Deed recorded at Book 1345, Page 113, Instrument Number 918649 in Tangipahoa Parish, Louisiana, is Ridgeway Development Company, LLC, a Louisiana limited liability company.

Based on this fact, Debtor's schedules and other relevant motions and documents will be amended or withdrawn as applicable.

Debtor filed a motion to approve the sale of this "Covey Rise Lot," which was pending before the Bankruptcy Court. *See* Docket No. 171. On September 7, 2016, Debtor filed a motion to withdraw that motion to approve sale, as the lot is not owned by the Debtor. On September 8, 2016, the Court entered an order approving that motion to withdraw.

However, as Exhibit A to Docket No. 171 shows, Adam Worth of New Orleans, Louisiana, has executed a Bill of Sale and has agreed to purchase the Covey Rise Lot for $105,000.

Ridgeway Development Company, LLC, will continue to pursue this sale, and will contribute the $105,000 from this sale, less amounts withheld to pay associated income taxes and or costs of the sale, to the Debtor and or Reorganized Debtor to pay Allowed Claims pursuant to the terms and provisions of the Plan. No commission is owed as a result of this sale to any real estate agent, and capital gains taxes are estimated to be withheld from the gross sale figure in the amount of $3,900, thus it is presently anticipated that $101,100 will be available from this sale to the Debtor and/or Reorganized Debtor to fund obligations under the Plan on or before the Effective Date.

**(a.)** **Toyota Highlander 2011 ("2011 Toyota Highlander Sale")**

On or before the Effective Date, it is presently anticipated that the Debtor and/or Reorganized Debtor will receive $22,500 from the sale of one 2011 Toyota Highlander, Limited, Gray, Vehicle Identification Number STDYK3EH9B1049260, which will be utilized to pay Allowed Claims pursuant to the terms and provisions of the Plan on or before the Effective Date. A bill of sale with Everett Buick GMC for the purchase of this vehicle has been prepared pursuant thereto.

This asset has been described in the Debtor's Schedules as the Toyota Highlander 2011, see Docket No. 152 at 9.

Currently a motion to approve the above-described sale of the 2011 Toyota Highlander to Everett Buick GMC for $22,500 is pending before the Bankruptcy Court, see Docket No. 174, and is set for hearing on September 27, 2016.

There is no commission owed to a sales agent for this sale, and there are no liens on this asset, thus Debtor and/or Reorganized Debtor are estimated to receive the full $22,500 in gross sale proceeds, and will be utilize to pay the Allowed Claims pursuant to the terms and provisions of the Plan on or before the Effective Date.

### (b.)   GMC Yukon SUV 2008 Model, ("2008 GMC Yukon Sale")

On or before the Effective Date, it is presently anticipated that Debtor and/or Reorganized Debtor will receive $18,500 from the sale of one 2008 GMC Yukon, Denali, Black, Vehicle Identification Number 1GKFK63898J194711, which will be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan. A bill of sale with Everett Buick GMC for the purchase of this vehicle has been prepared pursuant thereto.

This asset has been described in the Debtor's Schedules as the GMC Yukon SUV 2008, see Docket No. 152 at 9.

Currently a motion to approve the above-described sale of the 2008 GMC Yukon to Everett Buick GMC for $18,500 is pending before the Bankruptcy Court, see Docket No. 174, and is set for hearing on September 27, 2016.

There is no commission owed to a sales agent for this sale, and there are no liens on this asset, thus Debtor and Reorganized Debtor are estimated to receive the full $18,500 in gross sale proceeds, and will be utilized to pay the Allowed Claims pursuant to the terms and conditions of under the Plan on or before the Effective Date.

### (c.)   Sale of 24 Foot Yellowfin – Boat in Fort Beauregard, Chalmette, LA ("24 Foot Yellowfin Boat Sale")

On or before the Effective Date, it is anticipated that Debtor and/or Reorganized Debtor will receive $87,500 from the sale of one 2012 Yellowfin Yacht, Identification No. YKY23203F212, Vessel Registration No. FL3416PJ, which will be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan. A bill of sale executed by Bart Knellinger for the purchase of this boat has been prepared pursuant thereto.

This asset has been described in the Debtor's Schedules as the 24 Foot Yellowfin, 2012 Year, see Docket No. 152 at 9.

Currently a motion to approve the above-described sale of the 2012 Yellowfin Yacht to Bart Knellinger of Florida for $87,500 is pending before the Bankruptcy Court, *see* Docket No. 184, and is set for hearing on September 27, 2016.

There is no commission owed to a sales agent for this sale.

A proof of claim has been filed by U.S. Bank National Association, Claim No. 17-1, in the amount of $68,557.26, asserting this full amount is secured by a security interest in the 24 Foot Yellowfin at issue.

Thus, on or before the Effective Date the Debtor and/or Reorganized Debtor are estimated to receive $87,500 from the sale of this 24 Foot Yellowfin Yacht/Boat, which will first be utilized to satisfy the $68,557.26 claim of U.S. Bank National Association to the extent it is Allowed, and any surplus thereafter will be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan.

**(d.)** **Sale and/or insurance proceeds from damage of 39 Foot Yellowfin – ("39 Foot Yellowfin")**

Through this Plan, Debtor intends to sell his 2016 Yellowfin Boat, "Reel Fight," 39CC, 39 feet long, Hull No. YFY39083I516, Reg./Doc No. 1265326 (the "39 Foot Yellowfin"). This asset has been described in the Debtor's Schedules as Yellowfin 39 foot, 2016, *see* Docket No. 152 at 9.

A motion to approve a listing agreement and to employ a listing agent to work to sell this asset was approved by order of the Bankruptcy Court on July 7, 2016 – the agreed initial listing price was set at $499,900.00. *See* Docket No. 99-1.

While Debtor was transporting the 39 Foot Yellowfin Boat to Delacroix, Louisiana for a sea trial with a prospective buyer, the Debtor was involved in an accident wherein the 39 Foot Yellowfin Boat and trailer were damaged.

Debtor has insurance on the 39 Foot Yellowfin Boat and trailer up to the sum of $450,000.00. Debtor has made a claim with his insurance carrier NBOA. Yellowfin (the

47

manufacturer) has determined that the 39 Foot Yellowfin is a total loss with insurance coverage up to the sum of $450,000.00, subject to a deductible the Debtor estimates may be approximately $10,000.00.

Creditor M&T Bank has filed a proof of claim for $254,295.13, and has asserted this full amount is secured by a lien on the 39 Foot Yellowfin Boat.

Any proceeds from insurance should be sufficient to pay the aforementioned claim of M&T Bank, in full, assuming the same is Allowed in that amount, and any surplus thereafter would be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan on or before the Effective Date.

In the event that the insurance carrier declares the 39 Foot Yellowfin a total loss, Debtor estimates that approximately $195,704.87 of insurance proceeds to be available after payment of the Allowed Secured Claim as outlined in Class 7 of this Plan on or before the Effective Date.

In the event that the insurance carrier does not declare the 39 Foot Yellowfin a total loss, the Debtor intends to proceed, after repairs, to sell the 39 Foot Yellowfin. In the event of a sale, after withholding amounts for estimated commission and the amount necessary to ensure the U.S. Trustee fee associated with the disbursement of these sales proceeds is covered, Debtor or Reorganized Debtor would hope to realize $444,910.00 from this sale to be utilized, first to satisfy the Claim in Class 7 of the Plan, and then to pay the Allowed Claims pursuant to the terms and provisions of this Plan.

**(e.)    Sale and/or trade-in of 2016 Mercedes**

Through this Plan, Debtor intends to sell or trade-in his Mercedes S63, Year 2016, Vehicle Identification Number WDDUG7JB5GA219374 (the "2016 Mercedes"). This asset has been described in the Debtor's Schedules as Mercedes S63, Year 2016, *see* Docket No. 152 at 9.

After accounting for any potential costs of sale or potential commissions, the Debtor intends to utilize proceeds from a sale or trade in to first satisfy the claim of JP Morgan Chase Bank, N.A, and any surplus thereafter would be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan on or before the Effective Date.

**(f.)    Sale and/or trade-in of Ford F350**

Through this Plan, Debtor intends to sell or trade-in his Ford F350, Year 2015, Vehicle Identification Number 1FT8W3DTXFEB35540 (the "Ford F350"). This asset has been described in the Debtor's Schedules as Ford F350, Year 2015, *see* Docket No. 152 at 8.

After accounting for any potential costs of sale or potential commissions, if the Ford F350 is sold or traded in, the Debtor intends to utilize value or proceeds realized from such a sale

or trade-in to first satisfy the claim of Ford Motor Credit Company, and any surplus thereafter would be utilized to pay the Allowed Claims pursuant to the terms and provisions of the Plan on or before the Effective Date.

Section 7.8    **"Estimated Effective Date Funds"**    Amounts expected to be available through the Whale Loan, the Stone Clinical Earned Salary Distribution, the 38k Stone Biotechnologies Salary for the month of the Effective Date, the 50k Stone Clinical Salary for the month of the Effective Date, Residual Pre-Effective Date Cash, and amounts expected from sales for which bills of sale or similar documents have been prepared as of August 30, 2016, namely the Covey Rise Lot Sale, 2011 Toyota Highlander Sale, 2008 GMC Yukon Sale, and the 24 Foot Yellowfin Boat Sale, will be collectively referred to hereafter as "Estimated Effective Date Funds."

Under this definition, the sum total of current, Estimated Effective Date Funds is $4,723,175, based on the following values:

- Whale Loan - $4,250,000
- Stone Clinical Earned Salary Distribution - $150,000
- The 38k Stone Biotechnologies Salary for the month of the Effective Date - $38,575
- The 50k Stone Clinical Salary for the month of the Effective Date - $50,000
- Residual Pre-Effective Date Cash - $5,000
- The Covey Rise Lot Sale - $101,100
- 2011 Toyota Highlander Sale - $22,500
- 2008 GMC Yukon Sale, and - $18,500
- The 24 Foot Yellowfin Boat Sale - $87,500

Section 7.9    **Summary.**    Through a combination of exit financing, refinancing existing debt, sales of existing assets, and monthly income, the Debtor or Reorganized Debtor should have sufficient funds to satisfy the Claims asserted between the Schedules and the Claims Registry in the Bankruptcy Case, even, if need be, in the full amount of their value as stated by the respective creditors, within as little as a year.   Simultaneously, the Debtor or Reorganized Debtor intends to dispute claims on any and all relevant and appropriate grounds, by way of filed objections, adversary proceedings or other lawful means, and hopes this course of action will result in a reduction in the debt payable through the Plan.

Claims either listed on Debtor's Schedules or registered via a Proof of Claim as of July 29, 2016, and* the Claim arising from the Proof of Claim filed by the LDR in August of 2016, could be summarized as follows:

| Claims Summary as of July 29, 2016 (And the Claim of the LDR*) | | | |
|---|---|---|---|
| | | | |
| | | | |

| Creditor | Brief Description of Claim | Cite for Claim | Amount of Asserted Claim |
|---|---|---|---|
| **Secured Claims** | | | |
| Whitney Bank | Mortgagee on 579 Woodvine Avenue, Lot 31 Blk B Ft. Beauregard, Lot 4 Blk, NN, Phase 2B Alys Beach 23, La Garza Ct. | Proof of Claim 10 | $2,677,531.22 |
| Khoury & Vogt Architects, P.A. | Alys Beach Architect | Proof of Claim 13 | $123,000 |
| U.S. Bank | Lien Holder 24 Ft. Yellowfin | Proof of Claim 17 | $68,557.26 |
| Ally Bank | Lien Holder 2015 GMC Yukon | Proof of Claim 2 | $45,620.85 |
| JP Morgan Chase Bank, N.A. | Lien Holder 2016 Mercedes | Proof of Claim 16 | $149,206.68 |
| Ford Motor Credit Company | Lien Holder Ford 350 | Proof of Claim 5 | $17,376.97 |
| M&T Bank | Lien Holder 39 Foot Yellowfin | Proof of Claim 7 | $254,295.13 |
| | | Subtotal | **$3,335,588.11** |
| | | | |
| **Unsecured Priority Claims – Tax Related Claims** | | | |
| Internal Revenue Service | | Proof of Claim 1-2 | $369,571.13 |
| Louisiana Department of Revenue | | Proof of Claim 18-1 | $23,285.85 |
| Patrick Pilcher – Walton County Property Taxes | | Doc. 152; Fifth Amended Schedules | $12,180.43 |
| | | | |
| | | Subtotal | **$405,037.41** |
| | | | |
| **Unsecured Non-Priority Claims** | | | |
| Louisiana Department of Revenue | | Proof of Claim 18-1 | $1,254.00 |
| American Express acct. ****2008 - Centurion Bank | | Proof of Claim 3-1 | $7,575.24 |

| | | | |
|---|---|---|---|
| American Express acct. ****1007 - FSB | | Proof of Claim 4-1 | $12,771.75 |
| Bank of America Credit Card ****1786 | | Doc. 88; Amended Schedules | $46,060.97 |
| Chase Cardmember Services ****6686 | | Doc. 88; Amended Schedules | $8,162.46 |
| Ebsco Gulf Coast Development | | Doc. 88; Amended Schedules | $34,000.00 |
| Harold A. Asher, CPA, LLC | | Proof of Claim 11-1 | $52,076.64 |
| Internal Revenue Service | | Proof of Claim 1-2 | $17,280.34 |
| Fowler Rodriguez Flint Gray McCoy & Sullivan L.L.P. | | Proof of Claim 12 | $126,849.37 |
| Yard (for TD Retail) | | Proof of Claim 8-1 | $13,578.99 |
| American Express acct. ****4008 - Centurion Bank | | Proof of Claim 6-1 | $1,164.85 |
| Stryker Corporation and Howmedica Osteonics, Corp. | | Claims 14-1 and 15-1 | $3,432,147.71 |
| | | | |
| | | **Subtotal** | **$3,752,922.32** |
| | | | |
| | | | |

As described in Article IV, of the Plan, the Debtor and/or Reorganized Debtor will address Class 2, the full Allowed Secured Claim of Whitney Bank, on the Effective Date, by utilizing Estimated Effective Date Funds to pay Whitney Bank all accrued interest and attorneys' fees owing on the Notes on the Effective Date (as of August 9, 2016, interest and fees on said Notes were estimated to be $36,459), plus an additional $150,000.00 to reduce the principal amount owed on Note 5. Through the execution of new promissory notes and other documentation as described in Article IV, Section 4.2, the Debtor and/or Reorganized Debtor will refinance its remaining debt owed to Whitney.

Utilizing the Estimated Effective Date Funds remaining after addressing Class 2, on the Effective Date, Debtor will have sufficient funds to pay all Allowed amounts due under Classes 1, 3, 5, 6, 8, 9, and 10, leaving potentially only the Claims of Class 4 - JP Morgan Chase Bank, N.A., Class 7 – M&T Bank, and any newly emerging hereto unknown, unsecured claims falling under Class 11, to be addressed beyond the Effective Date. The Plan has adequate funds to provide the payments provided for herein to those three remaining classes.

In reference to the above-shown chart, as of the Effective Date, utilizing the Estimated Effective Date Funds, Debtor estimates it will have sufficient funds to satisfy all asserted claims

51

in the Unsecured Non-Priority Claims noted in the chart above, all the Unsecured Priority Claims noted in the chart above, and (sans Whitney Bank, which is addressed as described above) all Secured Creditors noted in the chart above, with the exception of J.P. Morgan Chase Bank, N.A. and M&T Bank.

The Secured Claim of M&T Bank in the amount of $254,295.13, is secured by a lien on the 39 Foot Yellowfin boat with a present estimated value of $499,900.00, which was recently damaged in an accident. Debtor has made a claim with his insurance carrier NBOA for the damages to the boat.  It is presently contemplated that the 39 Foot Yellowfin is a total loss with insurance coverage up to the sum of $450,000.00, which insurance proceeds should be sufficient to pay amounts due under Class 7 and allow for a surplus to fund other obligations under the Plan.  In the event that the insurance carrier does not declare the 39 Foot Yellowfin a total loss, the Debtor intends to proceed, after repairs, to sell the 39 Foot Yellowfin.  After withholding fees and costs associated with the 39 Foot Yellowfin Sale, the Debtor estimates this sale will provide sufficient funds to satisfy any Allowed Claim of M&T and will likely result in a net surplus to be held in the Escrow Account to ensure other contemplated payments are made under the Plan.

The Secured Claim of JP Morgan Chase Bank in the amount of $149,206.68 is secured by a lien on the 2016 Mercedes S63. It is anticipated, after a sale and/or trade-in of that vehicle, that any remaining balance, if any, on the Secured Claim of JP Morgan Chase Bank will be treated in Class 11.  Debtor is of the opinion that from the financing/sales process outlined herein, even before considering the 38k Stone Biotechnologies Salary or the 50k Stone Clinical Salary, there would be sufficient amounts which Debtor will hold in the Escrow Account after the sales discussed herein which could satisfy this remaining debt to JP Morgan Chase.

As it is possible that the 39 Foot Yellowfin and the 2016 Mercedes S63 may not be sold and/or traded-in within the first month following the Effective Date, Debtor or Reorganized Debtor propose herein to make monthly payments as set forth in Classes 4 and 7, to JP Morgan Chase Bank and M&T Bank respectively, for each month these creditors await final payment of their Allowed Claim through the sale, trade-in and/or receipt of insurance proceeds regarding the collateral securing their Claims.

Debtor submits that this Plan should result in satisfaction of all Allowed claims in less than a year, and is conservative, with reserves to address unforeseen developments and contingencies.

Section 7.10  **Causes of Action**.  The Debtor and, after the Effective Date, the Reorganized Debtor, own, retain, specifically reserves and shall have the exclusive right to bring, prosecute, waive, release, compromise, and settle all existing rights, claims and causes of action that prior to confirmation of this Plan belonged to the Debtor, including but not limited to the Causes of Action which are specifically listed as retained under the terms of this Plan pursuant to **Exhibit B** attached and incorporated hereto and, notwithstanding anything herein to the contrary, none of these rights, claims or causes of action shall be impaired in any way by this Plan,

Confirmation, the occurrence of the Effective Date, or otherwise. The Debtor and, after the Effective Date, the Reorganized Debtor will pursue those rights, claims, and Causes of Action that it, in the sole exercise of its business judgment and discretion, deem financially beneficial to the Estate. The recovery from all Causes of Action shall become Assets of the Debtor and, after the Effective Date, the Reorganized Debtor in accordance with this Plan. Further, the Debtor shall be entitled to offset such amounts as may be awarded to the Debtor or Reorganized Debtor with respect to such Causes of Action against Distributions due hereunder to the holder of a Claim, whether Disputed or Allowed. Neither the allowance of a Claim against the Debtor nor the making of Distributions pursuant hereto to a holder of Claims will bar or limit the right of the Debtor or Reorganized Debtor to bring any Causes of Action held against the holder of any Claim, even if the Claim that is Allowed or on account of which Distributions are made arises from the same agreement, transactions or occurrence from which the Causes of Action arise. All Causes of Action are reserved unto the Reorganized Debtor.

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into or effected in connection with or pursuant to the Plan, inaccordance with Bankruptcy Code section 1123(b), any and all claims and causes of action that were owned by the Debtor pre-petition or be the Debtor's estate as of the Effective Date, including, but not limited to, all Avoidance Actions under Sections 544, 547, 548, 549, 550 or applicable state law, shall vest in the Reorganized Debtor shall have the exclusive right to pursue and enforce such claims and causes of action.

### ARTICLE VIII
### DISTRIBUTIONS

Section 8.1 **Generally**. All distributions required under the Plan to Holders of Allowed Claims shall be made on or after the Effective Date, except as otherwise provided herein.

Section 8.2 **Distributions of Cash**. All Cash Distributions required under the Plan to Holders of Allowed Claims shall be made from the Escrow Account on or after the Effective Date, except as otherwise provided herein, from Cash on hand and/or surplus income available after the Confirmation Date through the Reorganized Debtor's income, after said salary is used to cover the personal budget and living expenses of the Reorganized Debtor, costs and expenses shall be paid in the ordinary course of business. Sums will also be realized through the sale of certain assets outlined above, and through distributions from Debtor's business, exit financing and/or refinancing current debt.

Section 8.3 **Record Date for Voting on Plan**. The transfer registers for each of the Classes of Claims and Interests as maintained by the Debtor or any third party shall be deemed closed on the date of entry of an order of the Bankruptcy Court approving the Disclosure Statement (or, with respect to any Class, any later date to which the Debtor agrees in its sole discretion) for purposes of voting on the Plan, and there shall be no further changes to reflect any new record Holders of any Claims for purposes of voting on the Plan.

Section 8.4 **Timing of Distributions**. Any Distribution to be made under the Plan on a day other than a Business Day shall be due on the next succeeding Business Day. If a Claim or portion thereof has not been Allowed at the time a Distribution in respect of that Claim or portion would be due under the Plan, then, subject to Article VIII, that Distribution shall not occur at that time and shall instead occur within ten (10) Business Days of the Claim or portion becoming Allowed; provided that, if a portion of the Claim has been Allowed at the time a Distribution is due, then, in accordance with Article VIII, the Distribution in respect of the Allowed portion may be made in accordance with the terms of the Plan.

Section 8.5 **Minimum Distributions; No Fractional Distributions; No Interest**. No Distribution of Cash less than Twenty-Five Dollars ($25.00) is required to be made to any Holder of an Allowed Claim unless a request therefore is made in writing to the Debtor or, after the Effective Date, the Reorganized Debtor. No Distribution of fractional dollars is required; Distributions shall be rounded up or down to the nearest whole dollar.

Section 8.6 **Delivery of Distributions**. Subject to Bankruptcy Rule 9010, distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed by the Debtor with the Bankruptcy Court, unless superseded by the address as set forth on proofs of claim filed by such Holders or other writing notifying Debtor or, after the Effective Date, the Reorganized Debtor of a change of address (or at the last known address of such a Holder if no proof of claim is filed or if the Debtor and Reorganized Debtor have not been notified in writing of a change of address).

Section 8.7 **Undeliverable Distributions**. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, no further Distributions to such Holder shall be made, unless and until the Debtor or, after the Effective Date, the Reorganized Debtor are notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder. All Claims for undeliverable Distributions shall be made on or before the later of 180 days after the Effective Date and the date ninety (90) days after such Claim is Allowed. After such date, all unclaimed property held for Distribution to any Holder of an Allowed Claim shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code and shall become vested in the Reorganized Debtor and the Claim of any Holder with respect to such property shall be discharged and forever barred.

Section 8.8 **Withholding**. The Debtor or, after the Effective Date, the Reorganized Debtor may at any time withhold from any Distribution to any Holder of an Allowed Claim such amounts sufficient to pay any Tax or other charge that has been or may be imposed on such Holder with respect to the amount distributable or to be distributed under the income Tax laws of the United States or of any other Governmental Authority by reason of any Distribution provided for in the Plan, whenever such withholding is determined by the Debtor or, after the Effective Date, the Reorganized Debtor, in its sole discretion, to be required by any Law. The Debtor or, after the Effective Date, the Reorganized Debtor in the exercise of its sole discretion may enter into agreements with taxing or other Governmental Authorities for the payment of such amounts that may be withheld in accordance with the provisions of this paragraph. Notwithstanding the

foregoing, the Debtor or, after the Effective Date, the Reorganized Debtor, and any Holder of an Allowed Claim shall have the right with respect to the United States, or any other Governmental Authority, to contest the imposition of any tax or other charge by reason of any Distribution under the Plan.

Section 8.9    **Time Bar to Cash Payments**.    Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Debtor or, after the Effective Date, the Reorganized Debtor by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 180 days after the check was issued, and the failure timely to make any such claim shall result in such Claim being forever barred and discharged.

Section 8.10    **Existing Securities and Agreements**.    Upon the Effective Date, the Reorganized Debtor shall determine whether it is necessary for any Holder of any debenture, promissory note, pledge agreement, guarantee, mortgage, financing statement, share certificate, or other instrument evidencing a Claim, or a Lien related thereto, except as otherwise provided in the Disclosure Statement or Plan, to surrender such document and/or to execute such other documents to evidence the satisfaction and discharge of the Claim, Lien, or Equity Interest as provided for in the Plan.  The Reorganized Debtor shall provide prompt notice of the determination that surrender is necessary with respect to a Claim, Lien, or Equity Interest, and no Distribution on account thereof shall be made unless the surrender occurs, unless otherwise ordered by the Bankruptcy Court.

Section 8.11    **Right to Object to Claims.**    Except to the extent a Claim is Allowed hereunder, the Debtor and, after the Effective Date, the Reorganized Debtor shall have the exclusive right to object to the allowance, amount, or classification of Claims and such objections may be litigated (including to Final Order) by the Debtor or Reorganized Debtor, as the case may be, or compromised and settled in accordance with his business judgment without further order of the Bankruptcy Court.

Section 8.12    **Deadline for Objecting to Claims.**    As soon as reasonably practicable, but in no event later than ninety (90) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court (which may be ordered upon ex parte motion of the Reorganized Debtor), all objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims.  An objection shall notify the Holder of the Claim of the deadline for responding to such objection. However, notwithstanding the foregoing, the Debtor will also have the right to file objections to Claims of governmental units for (90) days after the September 19, 2016, bar date set for Claims of governmental units in this Court's order of July 20, 2016. *See* Docket No. 82.

Section 8.13    **Deadline for Responding to Objections.**    Except as otherwise agreed by the Debtor or after the Effective Date, the Reorganized Debtor and the Holder of the objected-to Claim or unless an order enlarging the time period for same is requested by the responding

creditor within thirty (30) days after service of an objection, and such request is granted by the Court, any written response to the objection must be filed with the Bankruptcy Court by the Holder of the objected-to Claim and must be served upon the Debtor or, after the Effective Date, the Reorganized Debtor and upon counsel to the Debtor or Reorganized Debtor, as the case may be within thirty (30) days after service of the objection.  Failure to file a written response in accordance with this provision shall constitute a waiver and release of the subject Claim, and shall cause the Bankruptcy Court to enter a default judgment against the non-responding Holder of the Claim granting the relief requested in the objection.

Section 8.14   **Estimation of Claims.**  The Debtor may request the Bankruptcy Court to estimate any contingent or Disputed Claim for purposes of allowance under Section 502(c) of the Bankruptcy Code.

Section 8.15   **Payment of Disputed Claims.**   A chart showing all Claims identified either in the Schedules filed by the Debtor or the Claims Registry of the Bankruptcy Case immediately following the July 29, 2016, bar date for Claims for non-governmental entities set by the Bankruptcy Court's order of June 20, 2016, plus the claim filed by the Louisiana Department of Revenue prior to the September 19, 2016, bar date for governmental units is attached hereto as Exhibit D.  As further detailed elsewhere in the Plan, it is anticipated funds from several sources will be available as of the Effective Date to pay Claims in this case.

However, though  those funds will be available for potential distribution on the Effective Date to potentially pay certain Claims on that date, any such payment will be made subject to and pursuant to the terms of this Plan, and the Reorganized Debtor will only pay Allowed claims. Furthermore, the Reorganized Debtor specifically reserves all its rights to object to any Claim in the time frame outlined in Article V of the Plan.

Subject to specific terms regarding objections or disputes or other treatment regarding specific Claims or Classes of Claims detailed elsewhere in the Plan, if Reorganized Debtor's funds are paid to satisfy a Claim, but a timely objection under Article V of the Plan is later filed, to the extent the objection is sustained, the relevant funds shall be returned and/or disgorged within 30 days of the Final Order on the objection to the Reorganized Debtor, except for a Final Order sustaining any objection to the Claim of a Creditor in Class 1 of the Plan, in which case the relevant funds shall be returned and/or disgorged to the Reorganized Debtor within 90 days of said Final Order; such returned and/or disgorged relevant funds will be held in reserve and utilized to pay Allowed Claims pursuant to the terms and provisions of  the Plan.  If an objection to a Claim is pending as of the Effective Date, then the Reorganized Debtor, in his discretion, may pay any amount of the funds not in dispute to the Holder of said Claim, or may hold all or the disputed portion of the entire amount reserved for said Claim either in the Escrow Account or as otherwise provided herein pending resolution of the objection; to the extent such objection is later resolved in favor of the creditor, affected funds will be distributed to the Holder of the Claim.  To the extent such objection is resolved in favor of the Reorganized Debtor, the funds and the interest attributable thereto shall be held in reserve by the Reorganized Debtor and

utilized to pay Allowed Claims pursuant to the terms and provisions of the Plan. The Reorganized Debtor may, but shall not be required to, make a Distribution with respect to the portion of a Disputed Claim that is not in dispute (if any) pending the resolution of the entire Claim

## ARTICLE IX
## ACCEPTANCE OR REJECTION OF THE PLAN

Section 9.1 **Classes Entitled to Vote**. Each Holder of an Allowed Claim or an Allowed Equity Interest in a Class of Claims or Equity Interests against the Debtor that may be impaired and is to receive a Distribution under the Plan, including any Holder of an Allowed Claim in Classes 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11 shall be entitled to vote separately to accept or reject the Plan. Each Holder of a Claim in a Class of Claims that is Unimpaired under the Plan, shall be deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

Section 9.2 **Class Acceptance Requirement**. An Impaired Class of Claims shall have accepted the Plan if (i) the Holder (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. For purposes of calculating the number of Allowed Claims in a class of Claims held by Holders of Allowed Claims in such class that have voted to accept or reject the Plan under Section 1126(c) of the Bankruptcy Code, all Allowed Claims in such class held by one entity or any Affiliate shall be aggregated and treated as one Allowed Claim in such class.

Section 9.3 **Cramdown**. In the event that any impaired Class of Claims shall not accept the Plan or be deemed not to have accepted the Plan, the Debtor reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan to provide treatment sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to the Class(es) not accepting the Plan or being deemed not to have accepted the Plan, and, in particular, the treatment necessary to meet the requirements of sections 1129(a) and (b) of the Bankruptcy Code with respect to the rejecting Class(es) and any other Class(es) affected by such modifications.

## ARTICLE X
## EFFECT OF CONFIRMATION OF PLAN

Section 10.1 **Vesting of Assets**. On the Effective Date, except as otherwise provided herein, all Assets of the Estate, including all Causes of Action, shall be transferred to, and shall vest in, the Reorganized Debtor, free and clear of all Liens and Claims, subject to the terms and conditions set forth herein.

Section 10.2   **Operation by Reorganized Debtor**.   After the Effective Date, the Reorganized Debtor may conduct his affairs, and may use, acquire, and dispose of Assets free of any restrictions imposed under the Bankruptcy Code, subject to the terms of the Plan.

Section 10.3   **Injunction**.  As and to the extent not inconsistent with Sections 524 and 1141 of the Bankruptcy Code, subject to the satisfaction of the terms of Section 1141 of the Bankruptcy Codeall Entities who have held, hold, or may hold Claims against the Debtor are permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or the Reorganized Debtor on account of any such Claim; (c) creating, perfecting or enforcing any Lien against the Debtor or Reorganized Debtor, or against any of its Assets, on account of any such Claim; and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or Reorganized Debtor or against the Assets of the Debtor or Reorganized Debtor on account of any such Claim or Interest.

Section 10.4   **Discharge of Debtor and Claims**.  Pursuant to Section 1141(d) of the Bankruptcy Code the distributions, rights and treatment that are provided in the plan, the rights afforded herein and the treatment of all Claims shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of every nature, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or the Reorganized Debtor, or any of its Assets. To the fullest extent permitted and not inconsistent with Sections 524 and 1141 of the Bankruptcy Code and the completion of payments under the Plan or other satisfaction of the terms of 11 U.S.C. § 1141(d)(5), (i) all such Claims against the Debtor and Reorganized Debtor shall be satisfied, discharged, and released in full and (ii) all Entities shall be precluded from asserting against the Debtor or, after the Effective Date, the Reorganized Debtor, and all the Assets or properties thereof, any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature, whether known or unknown, that occurred prior to the confirmation of the Plan, including all debts of the kind specified in sections 502(g), 502(h) or 502(i), and in each case, whether or not (a) a proof of claim or interest based upon such Claim or Equity Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) such Claim is allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of such Claim has accepted the Plan; provided that the discharge shall not apply to the Reorganized Debtor's obligations under the Plan or any Plan Document.  To the fullest extent permitted and not inconsistent with Sections 524 and 1141 of the Bankruptcy Code, and except as otherwise provided herein, subject to the occurrence of the Effective Date and the completion of payments under the Plan or other satisfaction of the terms of 11 U.S.C. § 1141(d), any default or "event of default" by the Debtor with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Case shall be deemed cured and all notes, liens, mortgages, security documents, certificates and other evidences of Claims, Security Interests, or Interests shall represent only the right to participate in distributions under the Plan.

This Bankruptcy Case is a chapter 11 proceeding filed by an individual, and, accordingly, the Debtor specifically reserves all rights to request and receive a discharge of all debts and all Claims to the fullest extent authorized by law, including 11 U.S.C. § 1141(d)(5).

Notwithstanding the foregoing, to the extent the claim of a Creditor included in Class 1 of the Plan constitutes a claim under 11 U.S.C. § 523(a)(1)(A), interest accruing on said portion of such claim pursuant to non-bankruptcy law, *e.g.*, 26 U.S.C. §§ 6621 and 6622, between the filing of the Petition and confirmation of the Plan, so called "gap" interest, will not be discharged to the extent required by law. *See* 11 U.S.C. § 507(a)(8); *Accord Johnson v. Internal Revenue Service (In re Johnson)*, 146 F.3d 252, 260 (5th Cir. 1998).

The language above shall not be construed to abrogate the rights of setoff otherwise preserved pursuant to 11 U.S.C. § 553 for any Creditor in Class 1.

Section 10.5    **No Successor Liability**.  Except as otherwise specifically provided in the Plan or the Confirmation Order, neither the Debtor nor the Reorganized Debtor will have any responsibilities, pursuant to the Plan or otherwise, for any liabilities or obligations of the Debtor relating to or arising out of the operations of or Assets of the Debtor whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date.  Except as otherwise specifically provided in the Plan, the Reorganized Debtor shall have no successor or transferee liability of any kind or character, for any Claims; provided that the Reorganized Debtor shall have the obligations for the payments specifically and expressly provided, and solely in the manner stated, in the Plan and the Plan Documents.

Section 10.6    **Settlement, Release, Injunction, Stay and Related Provisions.**

**Compromise and Settlement of Claims, Interests, and Controversies**

    (a)    **Compromise and Settlement**

Except as provided by the Plan, pursuant to sections 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims against, and Interests in, all Debtors, including all controversies relating to the contractual, legal, and subordination rights that a holder of an Allowed Claim against the Debtor may have with respect to such Allowed Claim or any distribution to be made on account of such Allowed Claim, including  the releases, exculpations, and injunctions provided herein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that

all such compromises and settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Claims, Interests or Creditors.

### (b)        Releases by Holders of Claims and Interests

To the fullest extent permitted by 11 U.S.C. § 1141(d), upon satisfaction of the terms of 11 U.S.C. § 1141(d), each holder of an Allowed Claim is deemed to have released and discharged the Debtor, its Estate, and Reorganized Debtorfrom any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's in- or out-of court restructuring efforts, transactions pursuant and/or related to the Exit Financing, (and any payments or transfers in connection therewith), any Avoidance Actions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements of the Debtor, the formulation, preparation, dissemination, negotiation, the restructuring of any Claim or Interest before or during the Chapter 11 Case, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by the Debtor on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Exit Financing Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to this Plan, the administration and implementation of the Plan other property pursuant to the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, including under any of the Exit Financing, and (ii) nothing in this provision shall, nor shall it be deemed to, release the Debtor and Reorganized Debtor from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of the Debtor and Reorganized Debtor's gross negligence, fraud, or willful misconduct. Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Debtor and Reorganized Debtor; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interest of the Debtor and his Estate; (4) fair, equitable and reasonable; (5) given and made after due notice and

opportunity for hearing; (6) an essential component of the Plan and the Exit Financing; and (7) a bar to any of the releasing parties asserting any claim or cause of action released pursuant to such releases.

(c) **Exculpations**. To the extent not inconsistent with Section 524(e) of the Bankruptcy Code or 26 U.S.C. § 6672, the Debtor and Reorganized Debtor shall not have or incur liability for any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Exit Financing, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Exit Financing Documents), the solicitation of votes with respect to this Plan, or any transaction contemplated by the Plan, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by Debtor and Reorganized Debtor on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtor's in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Exit Financing Documents, Escrow Agreement, the related agreements, instruments, and other documents (including the Exit Finance Documents), the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, the related agreements, instruments, and other documents (including the Exist Finance Documents), or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Debtor and Reorganized Debtor (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan may be legally responsible, nor shall their respective properties or assets incur any liability to any Holder of a Claim or other Entity, for any Claim, or for any act, event, or omission in connection with, relating to, or arising out of the Bankruptcy Case, the negotiation of the Plan, the Consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for any liability based on willful misconduct or gross negligence. Such exculpation shall not extend to any post-Petition Date act of any of the foregoing other than in connection with their official capacity in the Bankruptcy Cases.

(d) **Term of Injunction or Stays**. Unless otherwise specifically provided herein or otherwise ordered by the Bankruptcy Court, all injunctions or stays set forth in 11 U.S.C. §§ 105 and 362 shall remain in full force and effect. Nothing in this Section, however, shall be

construed as a limitation of the permanent discharge and injunction provisions provided for in the Bankruptcy Code or Plan.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

Section 11.1 **Conditions**. The occurrence of the Effective Date and the substantial Consummation of the Plan are subject to satisfaction or, in the sole discretion of the proponents of the Plan, waiver of the following conditions precedent:

**Confirmation Order**. The Confirmation Order shall have become a Final Order and be in full force and effect.

**Execution of Documents; Other Actions**. All other actions and documents necessary to implement the Plan shall have been effected or executed. This includes but is not limited to, the drafting and execution of all documentation required for the $4.25 million dollar loan serving as exit financing under the terms of this Plan from Whale Capital, L.P., a Texas limited partnership, and all documentation required to refinance the Claim of Whitney Bank.

Section 11.2 **Notice of Effective Date**. The occurrence of the Effective Date and the substantial Consummation of the Plan shall be evidenced by a Notice of Effective Date filed with the Bankruptcy Court by the Reorganized Debtor within two (2) Business Days of the occurrence thereof.

Section 11.3 **Revocation of Confirmation Order or Withdrawal of Plan**. The Debtor may revoke or withdraw the Plan prior to the Confirmation Date by filing a Notice of Withdrawal of Plan in the record of the Bankruptcy Case. If the Plan is withdrawn prior to the Confirmation Date, then the Plan shall be deemed withdrawn and the Confirmation Order (if any has been issued but not entered on the docket) shall be automatically revoked without the need for any action by any party in interest or the Bankruptcy Court. In such event, the Plan and the Confirmation Order shall be of no further force or effect; the Debtor and all Holders of Claims shall be restored to the *status quo ante* as of the day immediately preceding the filing of the Plan; all the Debtor's respective obligations with respect to the Claims shall remain unchanged; and all of the Debtor's rights and claims against all Entities shall be fully preserved and nothing contained herein or in the Disclosure Statement shall be deemed to constitute an admission or statement against interest or to constitute a waiver or release of any claims by or against the Debtor or any other persons or to prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor or any other Entities.

## ARTICLE XII
## RETENTION OF JURISDICTION

Section 12.1 **Retention of Jurisdiction**. To the maximum extent permitted by the Bankruptcy Code or other applicable Law, the Bankruptcy Court shall have jurisdiction of all

matters arising out of, and related to, the Bankruptcy Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following nonexclusive purposes:

       **(a)**      To construe and to take any action to enforce this Plan and to issue such orders as may be necessary for the implementation, execution and confirmation of this Plan;

       **(b)**      To determine the allowance or classification of Claims (including Applicable Fees and Costs) and to determine any objections and/or estimations thereto;

       **(c)**      To determine rights to Distribution pursuant to this Plan;

       **(d)**      To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

       **(e)**      To determine any and all applications, motions, adversary proceedings, contested matters and other litigated matters that may be pending in the Bankruptcy Court on or initiated after the Effective Date;

       **(f)**      To hear and determine any objection and/or estimations to Administrative Expense Claims or Claims;

       **(g)**      To hear and determine any Causes of Action brought or continued by the Debtors to the maximum extent permitted under applicable Law including, but not limited to, the Causes of Action listed on the Disclosure Statement or Plan;

       **(h)**      To hear and determine motions of the Reorganized Debtor seeking the examination of any Entity pursuant to Bankruptcy Rule 2004, for purposes including investigations of potential Causes of Action, to the same extent the Debtor was entitled to seek such examinations prior to the Effective Date;

       **(i)**      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

       **(j)**      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

       **(k)**      To hear and determine matters concerning any release, exculpation, or discharge and to enforce the injunctions set forth in the Plan;

       **(l)**      To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

       **(m)**      To hear and determine all Fee Applications;

(n)   To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or any transactions, documents, or agreements contemplated by the Plan (including the Plan Documents);

(o)   To hear and determine all questions and disputes regarding title to, and any action to recover any of, the Assets or property of the Debtors or their Estates, wherever located;

(p)   To hear and determine matters concerning state, local, and Federal Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(q)   To consider and act on the compromise and settlement of any claim against the Debtors or their Estates;

(r)   To hear any other matter not inconsistent with the Bankruptcy Code; and

(s)   To enter a Final Decree closing the Bankruptcy Case, and to enter an order or a judgment granting a discharge pursuant to 11 U.S.C. § 1141(d)(5);

(t)   To hear such other and additional matters as provided by the Bankruptcy Code, Bankruptcy Rules and/or cases thereunder.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1   **Defects, Omissions, Amendments, and Modifications of the Plan**.

(a)   The Debtor may, with the approval of the Bankruptcy Court and without notice to Holders of Claims, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such a manner and to such extent necessary or desirable to expedite the execution of the Plan.

(b)   The Debtor may propose amendments or alterations to the Plan before or after Confirmation as provided in Section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code and the Debtor have complied with Section 1125 of the Bankruptcy Code.

(c)   The Debtor may propose amendments or alterations to the Plan before or after the Confirmation Date but prior to substantial Consummation, in a manner that, in the opinion of the Bankruptcy Court, does not materially and adversely affect Holders of Claims, so long as (i) the Plan, as modified, complies with Sections 1122 and 1123 of the Bankruptcy Code, (ii) the Debtor have complied with Section 1125 of the Bankruptcy Code, and, (iii) after notice and hearing, the Bankruptcy Court confirms such Plan, as modified, under Section 1129 of the Bankruptcy Code.

Section 13.2  **Severability**.  If the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, such provision shall be invalid, void, or unenforceable with respect to the Holder or Holders of such Claims as to which the provision is determined to be invalid, void, or unenforceable and, notwithstanding the invalidity, voidness, or unenforceability of such provision, the Debtor may proceed to seek confirmation of the Plan without such invalid, void, or unenforceable provision, in which case, invalidity, voidness, or unenforceability of such provision, shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

Section 13.3  **Successors and Assigns**.  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Entity.

Section 13.4  **Notices**.  Any notice required or permitted to be provided under the Plan shall be in writing and served by either (i) certified mail, return receipt requested, (or, for the United States, first class mail), postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, freight prepaid, addressed as follows:

If to the Debtor or Reorganized Debtor:

Christopher Martin Ridgeway
579 Woodvine Ave.
Metairie, LA 70005
Attention: Debtor/Reorganized Debtor


With copies, which shall not constitute notice, to:
Adams and Reese LLP
Attention: Robin B. Cheatham
4500 One Shell Square
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone: (504) 581-3234

Section 13.5  **Payment of Statutory Fees**.  Except as otherwise provided herein, for so long as the Bankruptcy Case shall remain open and pending before the Bankruptcy Court, all fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Debtor, with all such fees determined by the Bankruptcy Court at the Confirmation hearing to be due on or prior to the Effective Date being paid in Cash by the Reorganized Debtor on the Effective Date.

Section 13.6  **Additional Documents**.  On or before substantial Consummation of the Plan, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to reasonably effectuate and further evidence the terms and conditions of the Plan.

Section 13.7   **Retention of Claims and Causes of Action**

(a)   **Claims and Causes of Action:**   The Debtor owns the following claims and causes of action, and the causes of action described in Exhibit B to the Plan, which is attached to and incorporated into this Plan.

(b)   **Generally - Causes of Action.**   The Debtor may have other causes of action, including any and all claims, rights and causes of action that have been or could have been brought by or on behalf of the Debtor arising before, on or after the Petition Date, known or unknown, in contract or in tort, at law or in equity or under any theory of law, including, but not limited to any and all claims, rights and causes of action the Debtor or the Estate may have against any Person arising under chapter 5 of the Bankruptcy Code, or any similar provision of state law or any other law, rule, regulation, decree, order, statute or otherwise including avoidance actions as stated above, any and all claims, causes of action, counterclaims, demands, controversies, against third parties on account of costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, and executions of any nature, type, or description which the Debtor have or may come to have, including, but not limited to, negligence, gross negligence, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies (both civil and criminal), racketeering activities, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of fiduciary duty, breach of any alleged special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, whether or not in connection with or related to this Plan, at law or in equity, in contract in tort, or otherwise, known or unknown, suspected or unsuspected.  Under the Plan, all causes of action are retained by the Debtor for investigation and pursuit.

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into or effected in connection with or pursuant to the Plan, inaccordance with Bankruptcy Code section 1123(b), any and all claims and causes of action that were owned by the Debtor pre-petition or be the Debtor's estate as of the Effective Date, including, but not limited to, all Avoidance Actions under Sections 544, 547, 548, 549, 550 or applicable state law, shall vest in the Reorganized Debtor shall have the exclusive right to pursue and enforce such claims and causes of action.

(c)   **Claims against Stryker Corporation and/or Howmedica Ostenoics Corp., Their respective parents subsidiaries and/or affiliates.**

The Debtor, and after the Effective Date, Reorganized Debtor specifically reserves any and all rights, claims, and interests in causes of action including but not limited to cross claims, counterclaims, and claims for damages, fraud, violations of the Louisiana Unfair Trade Practices

Act, tortious interference with a contract and business relationships, loss of salary and profits from Stone Surgical through the previous distributorship agreement with Biomet and from injury to the Debtor and/or Reorganized Debtor's reputations with his clients and the resulting loss in business, fees, attorney fees and costs and expenses, and rights of setoff, offset, and recoupment against Stryker Corporation and/or Howmedica Osteonics Corp., their respective parents, subsidiaries and/or affiliates of Stryker Corporation and/or Howmedica Osteonics Corp. and any and all persons or entities, including but not limited to their respective parents, subsidiaries and/or affiliates, arising in, related to or arising from and based on the facts at issue in the litigation entitled *Stryker Corporation et al. v. Christopher Ridgeway, et al*, Case No. 13-cv-1066, consolidated *with Stone Surgical, LLC v. Stryker Corporation, et al.*, Case No. 14-cv-889, all in the United States District Court for the Western District of Michigan, Southern Division, and any appeal from a March 9, 2016, judgment in that case, which is presently pending in the United States Court of Appeals for the Sixth Circuit; the relevant consolidated case numbers for the Court of Appeal being Case Nos. 16-1434 and 16-1654 and any subsequent appeal therefrom or further review thereof including rehearing, en banc hearing, remand and/or writ of certiorari to the United States Supreme Court.  This reservation of rights also includes but is not limited to any and all rights, claims, defenses, and/or causes of action of the Debtor and/or Reorganized Debtor arising out of or related to the adversary action initiated by Stryker on June 20, 2016, in the Bankruptcy Court, which was assigned case number 16-01025, and captioned *Stryker Corporation and Howmedica Osteonics Corp. v. Christopher Martin Ridgeway.*

      **(d)**      **Any claims against National Boat Owners Association, Star Insurance Company, State Farm Insurance Company, their respective parents, subsidiaries, affiliates and any other insurer, their respective parents, subsidiaries, affiliates on any policies issued to and in favor of Debtor regarding 39 foot Yellowfin boat and Ford F350 truck.**

Subsequent to the Petition Date, Debtor marketed the 39 Foot Yellowfin Boat for sale with the intention to use the proceeds of said sale to pay the lien of M&T Bank.  While Debtor was transporting the 39 Foot Yellowfin Boat to Delacroix, Louisiana for a sea trial with a prospective buyer, the Debtor was in an accident wherein the 39 Foot Yellowfin Boat and trailer and the 2015 F350 truck were damaged.

Debtor has insurance on the 39 Foot Yellowfin Boat and trailer in the amount of $450,000.00 pursuant to a policy issued by National Boat Owners Association ("NOBA") and or Star Insurance Company.  Any proceeds from insurance should be sufficient to pay M&T Bank, which has a lien on the boat, in full.  The Debtor and/or Reorganized Debtor will use the remainder of any  proceeds to pay Allowed Claims of creditors in accordance with the terms of the Plan. Debtor specifically reserves any and all claims, rights, causes of action including but not limited to  any and all claims for damages, repairs, rental, diminution of value, loss of use and any and all other claims as it relates to in any way or arises in connection with any insurance policy issued to the Debtor by NOBA and or Star Insurance Company, its parents, subsidiaries and/or affiliates  regarding the 39 Foot Yellowfin Boat.

Debtor has insurance on the 2015 F350 truck pursuant to a policy issued by State Farm Insurance Company which should be sufficient to pay for the repairs to the 2015 F350 truck occurring from the accident.

The Debtor, and after the Effective Date, Reorganized Debtor specifically reserves any and all rights, claims and interests in causes of action or claims including but not limited to damages, repairs, rental, loss of use, diminution of value against National Boat Owners Association, Star Insurance Company, State Farm Insurance Company, their respective parents, subsidiaries and/or affiliates and/or  and any other insurer on any policies Issued to Debtor under Homeowners and/or Collision or General Liability policy, regarding the 39 Foot Yellowfin Boat and/or Ford F 350 truck as described herein.

**(e)** **Any and all claims against State Farm Insurance Company for Reimbursement of any sums which Debtor may be obligated to pay to Stryker Corporation/Howmedica Osteonics, Corp.**

The Debtor, and after the Effective Date, Reorganized Debtor specifically reserves any and all claims, rights, and interests in causes of action including but not limited to against State Farm Insurance Company ,and/or any other insurer, their respective parents, subsidiaries and/or affiliates that issued a homeowners policy or any such other policies to Debtor regarding any claims for reimbursement and/or coverage of any claims, sums, amount or judgment issued in favor of Stryker Corporation and Howmedica Osteonics Corp.

**ARTICLE XIV**
**DEFAULT UNDER THE PLAN**

Section 14.1   **Default Under the Plan**.  Except as otherwise provided in the Plan, any Holder of an Allowed Claim may seek relief with respect to any default under the Plan by first notifying the Debtor or Reorganized Debtor in writing of such alleged default under the Plan. In the event such written notice of a default is transmitted to the Debtor or Reorganized Debtor, the Debtor, Reorganized Debtor or any party in interest will have thirty (30) days after receipt of the notice to cure the alleged default.  Absent cure of the alleged default, the aggrieved party may then seek relief from the Bankruptcy Court.

DATED: February 20, 2017                    Respectfully submitted,

                                            */s/Robin B. Cheatham*
                                            Robin B. Cheatham, Bar Roll #4004
                                            ADAMS AND REESE LLP
                                            4500 One Shell Square
                                            701 Poydras Street, Suite 4500
                                            New Orleans, Louisiana  70139

Telephone:     (504) 585-0307
Fax:           (504) 566-0210
Email: robin.cheatham@arlaw.com

AND

Patrick L. McCune, Bar Roll #31863
ADAMS AND REESE LLP
North Chase Tower
450 Laurel Street, Suite 1900
Baton Rouge, LA  70801
Telephone:     (225) 378-3215
Fax:                (225) 336-5110
Email: patrick.mccune@arlaw.com
*Attorneys for Christopher Martin Ridgeway, the Debtor*

*/s/Christopher Martin Ridgeway*
Christopher Martin Ridgeway, Debtor
579 Woodvine Ave.
Metairie, LA 70005